Opinion for the court filed by Circuit Judge HENDERSON.
Concurring opinion filed by Circuit Judge HENDERSON.
Opinion concurring in the judgment in part and dissenting filed by Circuit Judge ROGERS.
Opinion concurring in the judgment in part and dissenting in part filed by Circuit Judge BROWN.
Opinion concurring in the judgment in part and dissenting in part filed by Circuit Judge KAVANAUGH.
On Petition for Rehearing En Banc
KAREN LeCRAFT HENDERSON, Circuit Judge:
Ali Hamza Ahmad Suliman al Bahlul (Bahlul) served as a personal assistant to Osama bin Laden, produced propaganda videos for al Qaeda and assisted with preparations for the attacks of September 11, 2001 that killed thousands of Americans. Three months after 9/11, Bahlul was captured in Pakistan and transferred to the United States Naval Base at Guantanamo Bay, Cuba. Military prosecutors charged him with three crimes: conspiracy to commit war crimes, providing material support for terrorism and solicitation of others to commit war crimes. A military commission convicted him of all three crimes and sentenced him to life imprisonment. The United States Court of Military Commission Review (CMCR) affirmed his conviction and sentence. Bahlul appeals. For the reasons that follow, we reject Bahlul’s ex post facto challenge to his conspiracy conviction and remand that conviction to the original panel of this Court for it to dispose of several remaining issues. In addition, we vacate his material support and solicitation convictions.
I. Background
Bahlul is a native of Yemen. In the late 1990s, he traveled to Afghanistan to join al Qaeda. He completed military-like training while staying at an al Qaeda guesthouse and eventually met and pledged an oath of loyalty (“bayat”) to bin Laden. Bin Laden assigned Bahlul to work in al Qaeda’s media office.
On October 12, 2000, al Qaeda suicide bombers attacked the U.S.S. Cole, killing 17 American servicemen and wounding 39 others. Bin Laden later instructed Bahlul to create a video celebrating the attack for use as a recruiting tool. The video Bahlul produced (and bin Laden edited) includes *6 footage of the attack, calls for jihad against the United States and propaganda blaming “Western infidels” and complicit Middle Eastern regimes for Muslim suffering. Bahlul considered it one of the best propaganda videos al Qaeda had produced and it has been translated into several languages and widely distributed.
Bin Laden then appointed Bahlul as his personal assistant and secretary for public relations. Bahlul arranged the loyalty oaths of two of the 9/11 hijackers, Mohamed Atta and Ziad al Jarrah, and prepared their “martyr wills”—propaganda declarations documenting al Qaeda’s role in the attacks. Bahlul claims he sought to participate in the 9/11 attacks himself but bin Laden refused because he considered his media man too important to lose. In the days preceding 9/11, Bahlul assembled al Qaeda’s media equipment and evacuated al Qaeda’s Kandahar headquarters with bin Laden and other senior al Qaeda leaders. They traveled to a remote region of Afghanistan where, on September 11, 2001, they heard reports of the day’s attacks via a radio operated by Bahlul. Bin Laden subsequently asked Bahlul to research the economic effects of the attacks and report his findings.
In the following weeks, Bahlul fled to Pakistan. He was captured there in December 2001 and turned over to U.S. forces. In 2002, he was transferred to the U.S. Naval Base at Guantanamo Bay, Cuba, where he has since been detained as an enemy combatant pursuant to the 2001 Authorization for Use of Military Force (AUMF). See Pub.L. No. 107-40, § 2(a), 115 Stat. 224, 224; Hamdi v. Rumsfeld, 542 U.S. 507, 518, 521, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (plurality). Two months after 9/11, President Bush invoked the AUMF and Article 21 of the Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 821 (hereinafter “section 821”), to establish military commissions to try “member[s] of ... al Qaida” and others who “engaged in, aided or abetted, or conspired to commit, acts of international terrorism, or acts in preparation therefor.” See Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism, 66 Fed.Reg. 57,833 (Nov. 13, 2001). In 2003, the President designated Bahlul eligible for trial by military commission and in 2004 military prosecutors charged him with conspiracy to commit war crimes.
Bahlul’s prosecution was stayed pending the outcome of another detainee’s challenge to the lawfulness of his trial by military commission. In Hamdan v. Rumsfeld, the United States Supreme Court held that the military commission procedures then in place contravened certain constraints imposed by the UCMJ and the four Geneva Conventions signed in 1949. 548 U.S. 557, 613-35, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006). In response to the Hamdan decision, the Congress enacted the Military Commissions Act of 2006 (2006 MCA), Pub.L. No. 109-336, 120 Stat. 2600, which amended the statutory procedures governing military commissions to cure the flaws identified in Ham-dan. The 2006 MCA specifically enumerated 30 war crimes triable by military commission, see 10 U.S.C. §§ 950t-950v (2006),[1] and conferred jurisdiction on military commissions to try “any offense made punishable by this chapter or the law of war when committed by an alien unlawful *7 enemy combatant before, on, or after September 11, 2001,” id. § 948d(a).
The Supreme Court has long recognized that unlawful enemy combatants may be prosecuted by military commission for their war crimes. See Hamdan, 548 U.S. at 592-98, 126 S.Ct. 2749; Hamdi 542 U.S. at 518, 124 S.Ct. 2633; In re Yamashita, 327 U.S. 1, 7-8, 11, 66 S.Ct. 340, 90 L.Ed. 499 (1946); Ex parte Quirin, 317 U.S. 1, 28, 31, 63 S.Ct. 2, 87 L.Ed. 3 (1942). There are three traditional bases for military commission jurisdiction: military government, martial law and the law of war. See Hamdan, 548 U.S. at 595-98, 126 S.Ct. 2749 (plurality opinion); see also id. at 683, 126 S.Ct. 2749 (Thomas, J., dissenting). First, military commissions may try ordinary crimes—e.g., manslaughter or robbery—and violations of military orders committed by both soldiers and civilians in territories under U.S. military government. Id. at 595-96, 126 S.Ct. 2749. Second, military commissions may try ordinary crimes and violations of military orders committed by soldiers and civilians in territory under martial law—as much of our country was during the Civil War. See id. at 595, 126 S.Ct. 2749; William Winthrop, Military Law and Precedents 832-34 (rev.2d ed.1920). Third, and “utterly different” from the first two categories, military commissions may try offenses against the law of war. Hamdan, 548 U.S. at 596, 126 S.Ct. 2749 (plurality opinion) (citation omitted). It is undisputed that the commission that tried Bahlul is of the third type: a law-of-war military commission. A military commission convened pursuant to the 2006 MCA must be composed of at least five “members,” who are qualified active duty officers of the armed forces and play a role similar to a petit jury. 10 U.S.C. §§ 948i, 948m. A military judge presides over the trial. Id. § 948j.
In 2008, military prosecutors amended the charges against Bahlul to allege three of the offenses enumerated in the 2006 MCA based on the conduct summarized above-conspiracy to commit war crimes, providing material support for terrorism and solicitation of others to commit war crimes. See id. §§ 950u, 950v(b)(25), 950v(b)(28) (2006). The conspiracy and solicitation charges alleged seven object crimes proscribed by the 2006 MCA: murder of protected persons, attacking civilians, attacking civilian objects, murder in violation of the law of war, destruction of property in violation of the law of war, terrorism and providing material support for terrorism. See id. § 950v(b)(l)-(3), (15)—(16), (24)-(25). Bahlul admitted all of the factual allegations against him, with the exception of the allegation that he had armed himself with a suicide belt to protect bin Laden. He nevertheless pleaded not guilty to the charged offenses because he denied the legitimacy of the military commission and sought to absent himself from the proceedings as a boycott. He objected to representation by appointed defense counsel and expressed a desire to proceed pro se, although his attempts to absent himself from the proceedings at times complicated matters and forced defense counsel to stand in for Bahlul and carry out his instructions not to present a defense. Bahlul waived all pretrial motions, asked no questions during voir dire, made no objections to prosecution evidence, presented no defense and declined to make opening and closing arguments.
The military commission convicted Bah-lul of all three offenses. Using a detailed findings worksheet, it found that Bahlul conspired to commit and solicited each of the seven alleged object offenses and that Bahlul committed ten of the eleven alleged overt acts. See Petitioner’s Appendix *8 (App.) 132-33.[2] The commission sentenced him to life imprisonment and the convening authority, Susan J. Crawford,[3] approved the findings and sentence. The CMCR affirmed Bahlul’s conviction and sentence in a 112-page opinion. See United States v. Bahlul, 820 F.Supp.2d 1141 (2011). Bahlul then appealed to this Court.
While Bahlul’s appeal was pending, this Court held that the 2006 MCA “does not authorize retroactive prosecution for conduct committed before enactment of that Act unless the conduct was already prohibited under existing U.S. law as a war crime triable by military commission.” Hamdan v. United States (Hamdan II), 696 F.3d 1238, 1248 (D.C.Cir.2012) (emphasis in original). The Court declared that providing material support for terrorism—the only charge at issue in that appeal—was not a pre-existing war crime triable by military commission; it therefore vacated Hamdan’s conviction on that offense. Id. at 1248-53. The Government subsequently conceded that Hamdan II’s reasoning required vacatur of all three of Bahlul’s convictions. Based on that concession, a panel of this Court vacated the convictions. Order, Bahlul v. United States, No. 11-1324, 2013 WL 297726 (D.C.Cir. Jan. 25, 2013). We subsequently granted the Government’s petition for rehearing en banc.
II. Standard of Review
Bahlul argues that the 2006 MCA must be construed to make triable by military commission only those crimes that were recognized under the international law of war when committed. He further contends that, if the 2006 MCA authorizes retroactive prosecution of new law-of-war offenses by military commission, his convictions violate the Ex Post Facto Clause. Bahlul made neither of these arguments before the military commission.
*9 “—‘No procedural principle is more familiar to this Court than that a constitutional right,’ or a right of any other sort, ‘may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.’ ” United States v. Olano, 507 U.S. 725, 731, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (quoting Yakus v. United States, 321 U.S. 414, 444, 64 S.Ct. 660, 88 L.Ed. 834 (1944)). This fundamental principle of appellate review generally bars a party who failed to preserve an argument in a lower tribunal from raising it on appeal absent plain error or exceptional circumstances. See United States v. Atkinson, 297 U.S. 157, 159, 56 S.Ct. 391, 80 L.Ed. 555 (1936); Salazar ex rel. Salazar v. Dist. of Columbia, 602 F.3d 431, 437 (D.C.Cir.2010).
To preserve error for appellate review, an appellant must interpose a “timely” objection, United States v. Simpson, 430 F.3d 1177, 1183 (D.C.Cir. 2005), and “state the specific ground for [the] objection,” United States v. Boyd, 54 F.3d 868, 872 (D.C.Cir.1995). Although he need not “cite the particular case that supports his position,” United States v. Rashad, 396 F.3d 398, 401 (D.C.Cir.2005), he must state the ground for his objection “with sufficient precision to indicate distinctly [his] thesis,” Miller v. Avirom, 384 F.2d 319, 322 (D.C.Cir.1967). Thus, “[a]n objection is not properly raised if it is couched in terms too general to have alerted the trial court to the substance of the petitioner’s point.” United States v. Breedlove, 204 F.3d 267, 270 (D.C.Cir. 2000); see also Noonan v. Caledonia Gold Min. Co., 121 U.S. 393, 400, 7 S.Ct. 911, 30 L.Ed. 1061 (1887) (“The rule is universal, that where an objection is so general as not to indicate the specific grounds upon which it is made, it is unavailing on appeal, unless it be of such a character that it could not have been obviated at the trial.”).
The contemporaneous-objection rule is not mere “obeisance to ritual.” Miller, 384 F.2d at 322. It serves two purposes. First, the rule promotes judicial efficiency by giving the trial tribunal the opportunity to quickly and efficiently resolve errors that would otherwise require burdensome and unnecessary appellate review and remand. See Puckett v. United States, 556 U.S. 129, 134, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009). Second, the rule discourages the intentional withholding of an objection by a party to be raised on appeal only if he loses at trial. See id.; see also Wainwright v. Sykes, 433 U.S. 72, 89, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); Hormel v. Helvering, 312 U.S. 552, 556, 61 S.Ct. 719, 85 L.Ed. 1037 (1941); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 238-39, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (citing Crumpton v. United States, 138 U.S. 361, 364, 11 S.Ct. 355, 34 L.Ed. 958 (1891)).
To mitigate the sometimes harsh results of the forfeiture rule in criminal cases, the Congress authorizes the court of appeals to exercise its discretion to notice and correct a certain type of forfeited error: “plain error.” Fed.R.CRIm.P. 52(b); see United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); see also 10 U.S.C. § 950a(a) (Supp. Ill 2010) (Military Commissions Act of 2009 review provision specifying that only errors that “materially prejudice[ ] the substantial rights of the accused” may be corrected).[4] A plain error is “[1] an ‘error’ [2] that is ‘plain’ and [3] that ‘affect[s] substantial *10 rights.’ ” Olano, 507 U.S. at 732, 113 S.Ct. 1770 (quoting Fed. R. Ckim P. 52(b)) (final alteration in original). “If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.” Johnson v. United States, 520 U.S. 461, 467, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (quotation marks and brackets omitted). Plain-error review, however, is “highly circumscribed.” United States v. Brinson-Scott, 714 F.3d 616, 625 (D.C.Cir.2013); see also Puckett, 556 U.S. at 134, 129 S.Ct. 1423 (“Meeting all four prongs is difficult, as it should be.” (quotation marks omitted)); Young, 470 U.S. at 15, 105 S.Ct. 1038 (“[T]he plain-error exception to the contemporaneous-objection rule is to be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.” (quotation marks omitted)). “There is good reason for this; anyone familiar with the work of courts understands that errors are a constant in the trial process, that most do not much matter, and that a reflexive inclination by appellate courts to reverse because of unpre-served error would be fatal” to the policies furthered by the contemporaneous-objection rule. Puckett, 556 U.S. at 134, 129 S.Ct. 1423 (quotation marks omitted). We therefore must guard against “unwarranted extension of this exacting definition of plain error.” Young, 470 U.S. at 15, 105 S.Ct. 1038.[5]
Applying these principles here, we conclude that Bahlul forfeited the arguments he now raises. He flatly refused to participate in the military commission proceedings and instructed his trial counsel not to present a substantive defense. Although he objected to the commission’s authority to try him, his objection was couched entirely in political and religious terms. He disclaimed guilt and contended that “what [he] did was not a crime.” Trial Tr. 175. But context makes clear that Bahlul argued that his acts were not criminal because they were inspired by religious fervor. See id. at 175-76. After claiming that the United States had “put on the side[ ] the meaningless American laws” and “legislated new laws” for “the planet Earth,” he explained that he “believe[s] that no one has the right in the land to set laws for the people, the right of legislating laws[] is absolutely to Allah, the All Mighty.” Id. at 23-24. Bahlul did ask a “legal question” about whether the “law here by you stems from the action, before action, or post action,” id. at 104, but the military judge could not ascertain what Bahlul was asking and Bahlul did not elaborate. Bahlul’s objection to the commission’s authority was unquestionably “too general to have alerted the trial court to the substance of [his] point.” United States v. Bolla, 346 F.3d 1148, 1152 (D.C.Cir.2003) (Roberts, J.) (quotation marks omitted); Breedlove, 204 F.3d at 270. Accordingly, we review his convictions for plain error.[6]
*11 Two of our colleagues contend that, by applying only plain-error review, we have provided insufficient clarity in this case. They argue that the Executive Branch’s need for guidance in this area warrants de novo review. Brown Op. 34, 62; Kava-naugh Op. 80. But the Government itself has asked that we apply plain-error review. E.B. Br. of the United States 63. Indeed, at oral argument, it insisted that we do so, notwithstanding the potential lack of “clarity” that such review might entail. Oral Arg. Tr. 45.
III. Statutory Analysis
As noted, Hamdan II held that the 2006 MCA “does not authorize retroactive prosecution for conduct committed before enactment of that Act unless the conduct was already prohibited under existing U.S. law as a war crime triable by military commission.” 696 F.3d at 1248. Because we conclude, for the reasons that follow, that the 2006 MCA is unambiguous in its intent to authorize retroactive prosecution for the crimes enumerated in the statute— regardless of their pre-existing law-of-war status—we now overrule Hamdan II’s statutory holding. See United States v. Burwell, 690 F.3d 500, 504 (D.C.Cir.2012) (en banc); Critical Mass Energy Project v. NRC, 975 F.2d 871, 876 (D.C.Cir.1992) (en banc); Save Our Cumberland Mountains, Inc. v. Hodel, 857 F.2d 1516, 1524 (D.C.Cir.1988) (en banc).[7]
*12 A. The 2006 MCA is Unambiguous
The 2006 MCA confers jurisdiction on military commissions to try “any offense made punishable by this chapter or the law of war when committed by an alien unlawful enemy combatant before, on, or after September 11, 2001.” 10 U.S.C. § 948d(a) (2006) (emphases added). “Any,” in this context, means “all.” See OxfoRD English Dictionary 539 (2d ed.1989) (“indifference as to the particular one or ones that may be selected”); see also Dep’t of Housing & Urban Dev. v. Rucker, 535 U.S. 125, 131, 122 S.Ct. 1230, 152 L.Ed.2d 258 (2002); United States v. Gonzales, 520 U.S. 1, 5, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997). The “offense[s] made punishable by this chapter” include the charges of which Bahlul was convicted: conspiracy to commit war crimes, providing material support for terrorism and solicitation of others to commit war crimes. 10 U.S.C. §§ 950u, 950v(b)(25), 950v(b)(28) (2006). There could hardly be a clearer statement of the Congress’s intent to confer jurisdiction on military commissions to try the enumerated crimes regardless whether they occurred “before, on, or after September 11, 2001.” And the provisions of the statute enumerating the crimes triable thereunder expressly “do not preclude trial for crimes that occurred before the date of the enactment of this chapter.” 10 U.S.C. § 950p(b) (2006). For good reason: If it were otherwise, section 948d’s conferral of jurisdiction to prosecute the enumerated crimes occurring on or before September 11, 2001 would be inoperative. See Corley v. United States, 556 U.S. 303, 314, 129 S.Ct. 1558, 173 L.Ed.2d 443 (2009) (“A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.” (quotation marks, brackets and ellipsis omitted)). Although we presume that statutes apply only prospectively “absent clear congressional intent” to the contrary, that presumption is overcome by the clear language of the 2006 MCA. Landgraf v. USI Film Prods., 511 U.S. 244, 280, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994); see also Johnson v. United States, 529 U.S. 694, 701, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000) (clear statement of intent overcomes presumption against ret-roactivity); Martin v. Hadix, 527 U.S. 343, 353-54, 119 S.Ct. 1998, 144 L.Ed.2d 347 (1999) (“ ‘unambiguous directive’ or ‘express command’” overcomes presumption against retroactivity); Reynolds v. M’Arthur, 27 U.S. (2 Pet.) 417, 434, 7 L.Ed. 470 (1829) (Marshall, C.J.) (“[L]aws by which human action is to be regulated ... are never to be construed retrospectively unless the language of the act shall render such construction indispensable.”).
Review of the inter-branch dialogue which brought about the 2006 MCA confirms the Congress’s intent to apply all of the statute’s enumerated crimes retroactively. See Boumediene v. Bush, 553 U.S. 723, 738, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008) (“acknowledging] ... the litigation history that prompted Congress to enact the MCA”). In Hamdan v. Rumsfeld, 548 U.S. 557, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006), the Supreme Court considered the President’s order that a military commission try Hamdan, a Guantanamo detainee, for one of the very crimes of which Bahlul was convicted: conspiracy to commit war crimes. Hamdan challenged the President’s authority to convene the military commission by petitioning for habeas corpus relief and the Supreme Court’s resulting decision initiated two games of inter *13 pretive ping-pong between the judiciary and the legislature. One involves the issue presented here: whether conspiracy is triable by a law-of-war military commission. In Hamdan, four justices concluded that it was not triable under the extant statute (section 821) and three concluded that it was. Compare Hamdan, 548 U.S. at 603-13, 126 S.Ct. 2749 (plurality opinion of Stevens, J.), with id. at 697-704, 126 S.Ct. 2749 (Thomas, J., dissenting). Four justices also “specifically invited Congress to clarify the scope of the President’s statutory authority to use military commissions to try unlawful alien enemy combatants for war crimes.” Hamdan II, 696 F.3d at 1243; see Hamdan, 548 U.S. at 636, 126 S.Ct. 2749 (Breyer, J., concurring) (“Nothing prevents the President from returning to Congress to seek the authority he believes necessary.”); id. at 637, 126 S.Ct. 2749 (Kennedy, J., concurring) (“If Congress, after due consideration, deems it appropriate to change the controlling statutes, in conformance with the Constitution and other laws, it has the power and prerogative to do so.”).
The Congress answered the Court’s invitation with the 2006 MCA, which provides the President the very power he sought to exercise in Hamdan—the power to try the 9/11 perpetrators for conspiracy—by including conspiracy as an offense triable by military commission, 10 U.S.C. § 950v(b)(28) (2006), and by conferring jurisdiction on military commissions to try alien unlawful enemy combatants for conspiracy based on conduct that occurred “before, on, or after September 11, 2001,” id. § 948d(a). We must heed this inter-branch dialogue, as Boumediene instructs. 553 U.S. at 738,128 S.Ct. 2229.
If this sounds familiar, it does so because it mirrors a second game of interpretive ping-pong begun in Hamdan. There, the Court also addressed the Government’s contention that section 1005(e)(1) of the Detainee Treatment Act of 2005(DTA), Pub.L. 109-148, 119 Stat. 2739, 2741-42—enacted after the Court’s grant of certiorari in Hamdan—ousted it of jurisdiction to entertain Hamdan’s habe-as petition. Hamdan, 548 U.S. at 572, 126 S.Ct. 2749. After a lengthy statutory analysis, the Court construed the DTA to apply only to petitions filed after the DTA’s enactment and, because Hamdan’s petition was filed before, the statute did not apply. Id. at 576-84, 126 S.Ct. 2749. In construing the DTA as it did, the Court avoided addressing “grave questions about Congress’ authority to impinge upon this Court’s appellate jurisdiction, particularly in habeas cases” and whether the Congress had unconstitutionally suspended the writ of habeas corpus. Id. at 575, 126 S.Ct. 2749. Although the Court relied on “[ojrdinary principles of statutory construction” to reach its result, id., its practical message to the Congress was clear: Stripping the courts of jurisdiction over detainees’ pending habeas petitions must be done unambiguously. Three justices dissented, arguing that the DTA was already unambiguous in its intent to repeal the Court’s jurisdiction. Id. at 656-69,126 S.Ct. 2749 (Scalia, J., dissenting).
The Congress returned serve in the 2006 MCA. Section 7(b) clarified that the bar to habeas jurisdiction applied to “all cases, without exception, pending on or after the date” of the statute’s enactment. 2006 MCA, § 7(b), 120 Stat. at 2636. Two years later, a detainee whose habeas petition was pending at the time of the 2006 MCA’s enactment argued that the statute did not apply to his case because section 7(b) was not a “sufficiently clear statement of congressional intent to strip the federal courts of jurisdiction in pending cases.” Boumediene, 553 U.S. at 737, 128 S.Ct. 2229. This time, the Court rejected the argument. It explained:
*14 If the Court invokes a clear statement rule to advise that certain statutory interpretations are favored in order to avoid constitutional difficulties, Congress can make an informed legislative choice either to amend the statute or to retain its existing text. If Congress amends, its intent must be respected even if a difficult constitutional question is presented. The usual presumption is that Members of Congress, in accord with their oath of office, considered the constitutional issue and determined the amended statute to be a lawful one; and the Judiciary, in light of that determination, proceeds to its own independent judgment on the constitutional question when required to do so in a proper case. If this ongoing dialogue between and among the branches of Government is to be respected, we cannot ignore that the MCA was a direct response to Hamdan’s holding that the DTA’s jurisdiction-stripping provision had no application to pending cases.
Id. at 738, 128 S.Ct. 2229 (emphases added). Having avoided the Suspension Clause issue in Hamdan by virtue of its construction of the statute and having been answered by the Congress’s reenactment of its retroactive intent, the Court had no choice but to resolve the difficult constitutional question presented (whether the MCA violated the Suspension Clause).
The same thing happened here. In enacting the military commission provisions of the 2006 MCA, the Congress plainly intended to give the President the power which Hamdan held it had not previously supplied—just as the 2006 MCA clarified that in fact the Congress did intend section 7(b)’s ouster of habeas jurisdiction to apply to pending cases. The legislative history confirms this view. See Bourne-diene, 553 U.S. at 739, 128 S.Ct. 2229 (“The Court of Appeals was correct to take note of the legislative history when construing the statute.... ”). Supporters and opponents of the legislation alike agreed that the 2006 MCA’s purpose was to authorize the trial by military commission of the 9/11 conspirators.[8] And because the 9/11 conspiracy took place long before 2006, the statute could accomplish its explicit purpose only if it applied to pre-enactment conduct. As the Court itself made clear, “we cannot ignore that the [2006] MCA was a direct response to *15 Hamdan ’s holding.” Boumediene, 553 U.S. at 739, 128 S.Ct. 2229.
Reading the MCA in this context and given the unequivocal nature of its jurisdictional grant, we conclude the 2006 MCA unambiguously authorizes Bahlul’s prosecution for the charged offenses based on pre-2006 conduct.
B. The Avoidance Canon is Inapplicable
Hamdan II’s contrary conclusion turned on the following provision of the 2006 MCA:
(a) PüRpose.—The provisions of this subchapter codify offenses that have traditionally been triable by military commissions. This chapter does not establish new crimes that did not exist before its enactment, but rather codifies those crimes for trial by military commission.
(b) EpfeCt.—Because the provisions of this subchapter (including provisions that incorporate definitions in other provisions of law) are declarative of existing law, they do not preclude trial for crimes that occurred before the date of the enactment of this chapter.
10 U.S.C. § 950p (2006). In Hamdan II, the Court read this provision to reflect the Congress’s “belie[f| that the Act codified no new crimes and thus posed no ex post facto problem.” 696 F.3d at 1247. Because the Congress was wrong in its textually stated premise—ie., the Act did codify new war crimes—the Court found “at least something of an ambiguity” in the statute. Id. at 1248. It then turned to the avoidance canon to resolve the ambiguity, concluding that the Congress intended to authorize retroactive prosecution only if “the conduct was already prohibited under existing U.S. law as a war crime triable by military commission.” Id.
The “avoidance canon” reflects a fundamental principle of judicial restraint. See Ashwander v. TVA 297 U.S. 288, 341-48, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandéis, J., concurring). But “[t]he canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction; and the canon functions as a means of choosing between them.” Clark v. Martinez, 543 U.S. 371, 385, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005) (emphasis in original); see also Milavetz, Gallop & Milavetz, P.A. v. United States, 559 U.S. 229, 239, 130 S.Ct. 1324, 176 L.Ed.2d 79 (2010). If, after applying ordinary principles of textual analysis, the statute is not genuinely open to two constructions, the “canon of constitutional avoidance does not apply.” Gonzales v. Carhart, 550 U.S. 124, 154, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007). Because the 2006 MCA unqualifiedly confers jurisdiction on military commissions to try “any offense made punishable by this chapter or the law of war when committed by an alien unlawful enemy combatant before, on, or after September 11, 2001,” 10 U.S.C. § 948d(a) (2006) (emphases added), it is not “fairly possible” to read the statute to apply only prospectively. United States v. Jin Fuey Moy, 241 U.S. 394, 401, 36 S.Ct. 658, 60 L.Ed. 1061 (1916) (Holmes, J.).
Hamdan II perceived a “tight causal link between (i) Congress’s belief that the statute codified only crimes under pre-existing law and (ii) Congress’s statement that the new statute could therefore apply to conduct before enactment.” 696 F.3d at 1247-48. We think that link plainly affirms the Congress’s intent to apply the statute retroactively. “The Congress is a coequal branch of government whose Members take the same oath we do to uphold the Constitution of the United States.” Rostker v. Goldberg, 453 U.S. 57, 64, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981). We assume that, in meeting that oath, it *16 “legislates in the light of constitutional limitations.” Rust v. Sullivan, 500 U.S. 173, 191, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991); see also Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988); FTC v. Am. Tobacco Co., 264 U.S. 298, 305-06, 44 S.Ct. 336, 68 L.Ed. 696 (1924); United States v. Harris, 106 U.S. 629, 635, 1 S.Ct. 601, 27 L.Ed. 290 (1883); Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 164, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring). As section 950p makes abundantly clear, the Congress made precisely that assessment and, whether right or wrong, concluded that the statute fell within the constitutional limits of its legislative authority. See City of Boerne v. Flores, 521 U.S. 507, 535, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) (“When Congress acts within its sphere of power and responsibilities, it has not just the right but the duty to make its own informed judgment on the meaning and force of the Constitution.”); United States v. Nixon, 418 U.S. 683, 703, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (“In the performance of assigned constitutional duties each branch of the Government must initially interpret the Constitution, and the interpretation of its powers by any branch is due great respect from the others.”). Indeed, the legislative history reveals the breadth of the Congress’s debate on the statute’s constitutionality. See, e.g., H.R.Rep. No. 109-664, at 25 (“For the reasons stated in Justice Thomas’s opinion [in Hamdan ], the Committee [on Armed Services] views conspiracy as a separate offense punishable by military commissions.”).
The “ambiguity” Hamdan II identified was the Congress’s failure to address what it “would ... have wanted” if it “had known that the Act was codifying some new crimes.” 696 F.3d at 1247. In other words, Hamdan II found the statute ambiguous because the Congress did not include in the text of the statute alternative language in case it was wrong in its reading of the law on which it premised its legislation. But the Congress always legislates on the basis of some set of facts or premises it believes to be true. It holds hearings and investigates precisely for the purpose of acquiring facts and then legislates on the basis of those facts. Because it believes to be true the facts on which it bases its legislation, the Congress seldom (if ever) includes instructions on what to do if those facts are proven incorrect. Here, the Congress authorized prosecution for “any offense made punishable by” the 2006 MCA, including offenses based on pre-enactment conduct, precisely because it believed that all of the offenses were already triable by military commission. The Congress’s plainly expressed belief about pre-enactment law should govern our understanding of the Congress’s intent expressed in the text of the statute. If judicial inquiry reveals that the Congress was mistaken, it is not our task to rewrite the statute to conform with the actual state of the law but rather to strike it down insofar as the Congress’s mistake renders the statute unconstitutional. See Ass’n of Am. Railroads v. U.S. Dep’t of Transp., 721 F.3d 666, 673 n. 7 (D.C.Cir. 2013) (“The constitutional avoidance canon is an interpretive aid, not an invitation to rewrite statutes to satisfy constitutional strictures.”), cert. granted (June 23, 2014).
Moreover, the avoidance canon ordinarily requires no speculation into the Congress’s hypothetical intent: If the statute’s text is ambiguous, we choose a constitutional construction over an unconstitutional one. Here, however, the “ambiguity” lies not in the text itself but in the text when read in light of Hamdan *17 II’s subsequent finding that the premise on which the text is based is wrong. That is, the “ambiguity” lies in the existence of matters unknown to the Congress. But “[w]e cannot replace the actual text with speculation as to Congress’ intent,” Magwood, v. Patterson, 561 U.S. 320, 130 S.Ct. 2788, 2798, 177 L.Ed.2d 592 (2010), nor can we “divin[e] what Congress would have wanted if it had thought of the situation before the court,” Morrison v. Nat’l Australia Bank Ltd., 561 U.S. 247, 130 S.Ct. 2869, 2881, 177 L.Ed.2d 535 (2010); see also United States v. Public Utilities Comm’n of Cal., 345 U.S. 295, 319, 73 S.Ct. 706, 97 L.Ed. 1020 (1953) (Jackson, J., concurring) (“Never having been a Congressman, I am handicapped in that weird endeavor. That process seems to me not interpretation of a statute but creation of a statute.”). For that reason, “our inquiry focuses on an analysis of the textual product of Congress’ efforts, not on speculation as to the internal thought processes of its Members.” Carter v. United States, 530 U.S. 255, 272, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000); see also Gardner v. Collins, 27 U.S. (2 Pet.) 58, 93, 7 L.Ed. 347 (1829) (“What the legislative intention was, can be derived only from the words they have used; and we cannot speculate beyond the reasonable import of these words.”).
Even if it may raise difficult constitutional questions, the statutory text remains the gravamen of our interpretive inquiry. See United States v. Raynor, 302 U.S. 540, 552, 58 S.Ct. 353, 82 L.Ed. 413 (1938). “Although [we] will often strain to construe legislation so as to save it against constitutional attack,” Aptheker v. Sec’y of State, 378 U.S. 500, 515, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964) (quotation marks omitted), a court cannot “rewrite a law to conform it to constitutional requirements, for doing so would constitute a serious invasion of the legislative domain,” United States v. Stevens, 559 U.S. 460, 481, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010) (quotation marks, ellipsis and citations omitted). “Here the intention of the Congress is revealed too distinctly to permit us to ignore it because of mere misgivings as to power. The problem must be faced and answered.” George Moore Ice Cream Co. v. Rose, 289 U.S. 373, 379, 53 S.Ct. 620, 77 L.Ed. 1265 (1933) (Cardozo, J.).
IV. Bahlul’s Ex Post Facto Challenge
Because the Congress’s intent to authorize retroactive prosecution of the charged offenses is clear, we must address Bahlul’s ex post facto argument. See Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 404, 5 L.Ed. 257 (1821) (Marshall, C.J.) (“Questions may occur which we would gladly avoid; but we cannot avoid them. All we can do is, to exercise our best judgment, and conscientiously to perform our duty.”). As noted, we may overturn Bahlul’s convictions only if they constitute plain constitutional error.
The Constitution prohibits the Congress from enacting any “ex post facto Law.” U.S. Const, art. I, § 9, cl. 3. “The phrase ex post facto law was a term of art with an established meaning at the time of the framing.” Peugh v. United States, — U.S. -, 133 S.Ct. 2072, 2081, 186 L.Ed.2d 84 (2013) (quoting Collins v. Youngblood, 497 U.S. 37, 41, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990)) (quotation marks omitted). In Calder v. Bull, Justice Chase set forth his understanding of that meaning:
1st. Every law that makes an action, done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2nd. Every law that aggravates a crime, or makes it greater than it was, when committed. 3rd. Every law that changes the punishment, and inflicts a greater punish *18 ment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender.
3 U.S. (3 Dall.) 386, 390,1 L.Ed. 648 (1798) (opinion of Chase, J.); see Peugh, 133 S.Ct. at 2081 (reciting Justice Chase’s formulation); Carmell v. Texas, 529 U.S. 513, 525, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000) (Supreme Court has “repeatedly endorsed” Justice Chase’s formulation); see also id. at 537-39, 120 S.Ct. 1620 (noting that Collins did not eliminate Justice Chase’s fourth category).
In our order granting en banc review, we asked the parties to brief whether the Ex Post Facto Clause applies in cases involving aliens detained at Guantanamo. The Government has taken the position that it does. Although we are not obligated to accept the Government’s concession, see Young v. United States, 315 U.S. 257, 258-59, 62 S.Ct. 510, 86 L.Ed. 832 (1942); United States v. Baldwin, 563 F.3d 490, 491 (D.C.Cir.2009), we will assume without deciding that the Ex Post Facto Clause applies at Guantanamo. In so doing, we are “not to be understood as remotely intimating in any degree an opinion on the question.” Petite v. United States, 361 U.S. 529, 531, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960) (per curiam); see also Casey v. United States, 343 U.S. 808, 808, 72 S.Ct. 999, 96 L.Ed. 1317 (1952) (per curiam) (“To accept in this case [the Solicitor General’s] confession of error would not involve the establishment of any precedent.”); United States v. Bell, 991 F.2d 1445, 1447-48 (8th Cir.1993).[9]
A. Conspiracy
We reject Bahlul’s ex post facto challenge to his conspiracy conviction for two independent and alternative reasons. First, the conduct for which he was convicted was already criminalized under 18 U.S.C. § 2332(b) (section 2332(b)) when Bahlul engaged in it. It is not “plain” that it violates the Ex Post Facto Clause to try a pre-existing federal criminal offense in a military commission and any difference between the elements of that offense and the conspiracy charge in the 2006 MCA does not seriously affect the fairness, integrity or public reputation of judicial proceedings. Second, it is not “plain” that conspiracy was not already triable by law-of-war military commission under 10 U.S.C. § 821 when Bahlul’s conduct occurred.
1. Section 2332(b)
Bahlul was convicted of conspiracy to commit seven war crimes enumerated in the 2006 MCA, including the murder of protected persons.[10] Although the 2006 *19 MCA post-dates Bahlul’s conduct, section 2832(b) has long been on the books, making it a crime to, “outside the United States,” “engage[ ] in a conspiracy to kill[ ] a national of the United States.” 18 U.S.C. § 2332(b); see Omnibus Diplomatic Security and Antiterrorism Act of 1986, Pub.L. No. 99-399, § 1202(a), 100 Stat. 853, 896. Section 2332(b) is not an offense triable by military commission but, the Government argues, “[t]he fact that the MCA provides a different forum for adjudicating such conduct does not implicate ex post facto concerns.” E.B. Br. of United States 67. We agree. See infra p. 31 (remanding to panel to determine Bahlul’s other constitutional challenges).
The right to be tried in a particular forum is not the sort of right the Ex Post Facto Clause protects. See Collins, 497 U.S. at 51, 110 S.Ct. 2715. In Collins, the Supreme Court sifted through its Ex Post Facto Clause precedent, noting that some cases had said that a “procedural” change—ie., a “change[] in the procedures by which a criminal case is adjudicated”—may violate the Ex Post Facto Clause if the change “affects matters of substance” by “depriving a defendant of substantial protections with which the existing law surrounds the person accused of crime or arbitrarily infringing upon substantial personal rights.” Id. at 45, 110 S.Ct. 2715 (citations, brackets and quotation marks omitted). The Court observed that such language had “imported confusion” into its doctrine and it attempted to reconcile that language so as to not enlarge the Ex Post Facto Clause’s application beyond laws that “make innocent acts criminal, alter the nature of the offense, or increase the punishment.” Id. at 46, 110 S.Ct. 2715. One case that could not be reconciled was Thompson v. Utah, in which the Court had found that a change in Utah law reducing the size of criminal juries from 12 to 8 persons violated the Ex Post Facto Clause by depriving the defendant of “a substantial right involved in his liberty.” 170 U.S. 343, 352-53, 18 S.Ct. 620, 42 L.Ed. 1061 (1898). The Court overruled Thompson in Collins, explaining that the reduced size of the jury was not in fact an ex post facto violation because “[t]he right to jury trial provided by the Sixth Amendment is obviously a ‘substantial’ one, but it is not a right that has anything to do with the definition of crimes, defenses, or punishments, which is the concern of the Ex Post Facto Clause.” Collins, 497 U.S. at 51, 110 S.Ct. 2715.
Similarly, in Cook v. United States, the Court held that an act vesting jurisdiction over a crime in a newly formed judicial district does not violate the Ex Post Facto Clause because “[i]t only ... subjects the accused to trial in th[e new] district rather than in the court of some other judicial district established by the government against whose laws the offense was committed. This does not alter the situation of the defendants in respect to their offense or its consequences.” 138 U.S. 157, 183, 11 S.Ct. 268, 34 L.Ed. 906 (1891); accord Gut v. Minnesota, 76 U.S. 35, 38, 9 Wall. 35, 19 L.Ed. 573 (1869) (“An ex post facto law does not involve, in any of its definitions, a change of the place of trial of an alleged offence after its commission.”); see also Duncan v. Missouri, 152 U.S. 377, 382-83, 14 S.Ct. 570, 38 L.Ed. 485 (1894) (suggesting no ex post facto violation where defendant’s appeal was heard by smaller appellate panel than provided for at time of his offense).
It is therefore not a plain ex post facto violation to transfer jurisdiction over a crime from an Article III court to a military commission because such a transfer does not have anything to do with the definition of the crime, the defenses or the punishment. That is so regardless of the *20 different evidentiary rules that apply under the 2006 MCA. See Carmell, 529 U.S. at 533 n. 23, 120 S.Ct. 1620 (change in “[o]rdinary rules of evidence ... do[es] not violate the [Ex Post Facto] Clause”); id. at 542-47, 120 S.Ct. 1620; Collins, 497 U.S. at 43 n. 3, 110 S.Ct. 2715; Beazell v. Ohio, 269 U.S. 167, 171, 46 S.Ct. 68, 70 L.Ed. 216 (1925); Thompson v. Missouri, 171 U.S. 380, 386-88, 18 S.Ct. 922, 43 L.Ed. 204 (1898); Hopt v. Utah, 110 U.S. 574, 589-90, 4 S.Ct. 202, 28 L.Ed. 262 (1884). Nor is this a case like Carmell, where a law retroactively reduced the “quantum of evidence necessary to sustain a conviction,” 529 U.S. at 530, 120 S.Ct. 1620; the 2006 MCA requires the Government to prove guilt beyond a reasonable doubt, see 10 U.S.C. § 949Z(c); see also Trial Tr. 233, 878 (military judge’s instructions to commission).[11]
Our inquiry is not ended, however, because the 2006 MCA conspiracy-to-murder-protected-persons charge and section 2332(b) do not have identical elements. The difference is a potential problem because the Ex Post Facto Clause prohibits “retrospectively eliminating an element of the offense” and thus “subverting] the presumption of innocence by reducing the number of elements [the government] must prove to overcome that presumption.” Carmell, 529 U.S. at 532, 120 S.Ct. 1620. Both statutes require the existence of a conspiracy and an overt act in furtherance thereof. See 18 U.S.C. § 2332(b)(2); 10 U.S.C. § 950v(b)(28) (2006); see also Trial Tr. 846, 849-50 (military judge’s instructions to commission). The 2006 MCA conspiracy charge is in one sense more difficult to prove than section 2332(b) because it applies only to alien unlawful enemy combatants engaged in hostilities against the United States. See 10 U.S.C. §§ 948b(a), 948c, 948d; see also Trial Tr. 843-45 (instructions). But the 2006 MCA charge is in two ways easier to prove than a section 2332(b) charge. It does not require that the conspiracy occur “outside the United States” or that the conspiracy be to kill a “national of the United States,” as section 2332(b) does. It simply requires a conspiracy to murder “one or more protected persons.” Trial Tr. 850-51 (instructions); see supra n. 10 (providing MCA’s definition of “protected person”). Although the two statutes are quite similar, then, the 2006 MCA conspiracy charge eliminates two elements required to convict a defendant under section 2332(b).[12]
*21 Nevertheless, Bahlul cannot bear his burden of establishing that the elimination of the two elements “seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings.” Olano, 507 U.S. at 732, 113 S.Ct. 1770 (quotation marks omitted); see United States v. Vonn, 535 U.S. 55, 62-63, 122 S.Ct. 1043, 152 L.Ed.2d 90 (2002) (defendant bears burden of proving Olano’s fourth prong); see also United States v. Johnson, 331 F.3d 962, 967 (D.C.Cir .2003) (proceeding directly to fourth prong if it can resolve appeal). He cannot satisfy the fourth prong because the charges against him and the commission’s findings necessarily included those elements and the evidence supporting them was undisputed. To explain why requires that we first discuss the most on-point Supreme Court precedent.
In Johnson v. United States, the Supreme Court reviewed a defendant’s conviction for perjury where the district court had decided the issue of materiality itself rather than submit that issue to the jury, as the Court’s precedent requires. 520 U.S. 461, 463, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997). The defendant did not object, however, so the Court reviewed his conviction for plain error. Because the evidence of the missing materiality element was “overwhelming” and “essentially uncontro-verted at trial,” the Court concluded that the error, although plain, did not seriously affect the fairness, integrity or public reputation of judicial proceedings. Id. at 470, 117 S.Ct. 1544; cf. Neder v. United States, 527 U.S. 1, 19, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (failure to submit element to jury was harmless error “where [the] defendant did not, and apparently could not, bring forth facts contesting the omitted element”). Similarly, in United States v. Cotton, the indictment failed to charge the drug quantity involved in the offense, as the Court’s precedent requires for any fact that enhances the otherwise applicable statutory maximum sentence. 535 U.S. 625, 627-28, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002). After the jury found the defendants guilty of a narcotics conspiracy, the district court made drug quantity findings that enhanced the defendants’ statutory máximums. Id. at 628, 122 S.Ct. 1781. This was “error” and it was “plain” but the Court nevertheless upheld the convictions under Olano’s fourth prong. Because the evidence of the requisite drug quantity was “overwhelming” and “essentially uncontroverted,” the Court concluded that “[t]he real threat ... to the fairness, integrity, and public reputation of judicial proceedings would be if [the defendants] ... were to receive a sentence prescribed for those committing less substantial drug offenses because of an error that was never objected to at trial.” Id. at 633-34, 122 S.Ct. 1781 (quotation marks omitted); accord Johnson, 331 F.3d at 966-70; United States v. Webb, 255 F.3d 890, 899-902 (D.C.Cir.2001).
Here, the evidence of the two missing elements was not simply “overwhelming” and “essentially uncontroverted”—it was entirely uncontroverted. Bahlul was charged with committing numerous overt acts “in Afghanistan, Pakistan and elsewhere” that furthered the conspiracy’s unlawful objects; those objects included the murder of protected persons. App. 122-25. He did not dispute that his conduct occurred outside the United States nor did he dispute that the purpose of the conspiracy was to murder United States nationals. See Trial Tr. 167 (Bahlul: “And what I did ... is to kill Americans....”); id. at 511— 12 (“[Bahlul] does not consider anybody protected personfs] or civilians.... [A]s long as you’re a[n] American, you are a target.”). Indeed, several witnesses testified that Bahlul considered all Americans to be targets. Id. at 503, 512, 596, 653. The commission was instructed on the *22 overt acts allegedly undertaken by Bahlul in furtherance of the conspiracy, see id. at 846-47, and was instructed that one of the conspiracy’s object offenses was the murder of protected persons, id. at 850. The commission specifically found that Bahlul committed ten overt acts, all of which took place outside the United States and several of which directly relate to the 9/11 attacks that killed thousands of United States nationals. App. 132-33. And it found that all seven of the alleged object offenses, including murder of protected persons, were objects of the conspiracy. App. 131. There is no scenario in which the commission could have found that Bah-lul committed these overt acts yet rationally found that the conspiracy did not take place outside the United States and did not have as an object the murder of United States nationals. Accord Webb, 255 F.3d at 901. Although the commission was not specifically instructed that it had to find these two elements, the overt acts it did find Bahlul had committed necessarily included the two elements and Bahlul did not, and does not, dispute either. Therefore, although the 2006 MCA conspiracy offense, as charged here, does “eliminatfe] an element of the offense,” Carmell, 529 U.S. at 532, 120 S.Ct. 1620, the omission did not seriously affect the fairness, integrity, or public reputation of the proceedings.
2. Section 821
When Bahlul committed the crimes of which he was convicted, section 821 granted—and still grants—military commissions jurisdiction “with respect to offenders or offenses that by statute or by the law of war may be tried by military commissions.” 10 U.S.C. § 821. Section 821 and its predecessor statute have been on the books for nearly a century. See Pub.L. No. 64-242, 39 Stat. 619, 653 (1916); Pub.L. No. 66-242, 41 Stat. 759, 790 (1920); Pub.L. No. 81-506, 64 Stat. 107, 115 (1950); Madsen v. Kinsella, 343 U.S. 341, 350-51 & n. 17, 72 S.Ct. 699, 96 L.Ed. 988 (1952). We must therefore ascertain whether conspiracy to commit war crimes was a “law of war” offense triable by military commission under section 821 when Bahlul’s conduct occurred because, if so, Bahlul’s ex post facto argument fails.
In answering this question, we do not write on a clean slate. In Hamdan, seven justices of the Supreme Court debated the question at length. Four justices concluded that conspiracy is not triable by military commission under section 821. 548 U.S. at 603-13, 126 S.Ct. 2749 (plurality opinion of Stevens, J.). Three justices opined that it is. Id. at 697-704, 126 S.Ct. 2749 (Thomas, J., dissenting). Both opinions scoured relevant international and domestic authorities but neither position garnered a majority. The case was resolved on other grounds and the eighth vote—one justice was recused—left the conspiracy question for another day, noting that the Congress may “provide further guidance in this area.” See id. at 655, 126 S.Ct. 2749 (Kennedy, J., concurring). In light of the uncertainty left by the split, it was not “plain” error to try Bahlul for conspiracy by military commission pursuant to section 821. See United States v. Terrell, 696 F.3d 1257, 1260 (D.C.Cir.2012) (plain error met only if “its erroneous character” is established by “a clear precedent in the Supreme Court or this circuit”).
The reason for the uncertainty is not only the divided result in Hamdan but also the High Court’s failure to clearly resolve a subsidiary question: What body of law is encompassed by section 821’s reference to the “law of war”? That dispute takes center stage here. Bahlul contends that “law of war” means the international law of war, full stop. The Government contends that we must look not only to international *23 precedent but also “the common law of war developed in U.S. military tribunals.” E.B. Br. of United States 28; see also Oral Arg. Tr. 15 (“[W]e believe the law of war is the international law of war as supplemented by the experience and practice of our wars and our wartime tribunals.”). The answer is critical because the Government asserts that conspiracy is not an international law-of-war offense. See E.B. Br. of United States 34; Oral Arg. Tr. 15.
In Hamdan II, the Court said that “law of war” as used in section 821 is a term of art that refers to the international law of war. 696 F.3d at 1248; see also id. at 1252 (noting that “U.S. precedents may inform the content of international law”); cf. Kavanaugh Op. 68 n. 5 (stating that Hamdan II’s interpretation of section 821 “was not necessary to the result”). Language in several Supreme Court opinions supports that proposition. See, e.g., Quirin, 317 U.S. at 27-28, 63 S.Ct. 2 (“[T]his Court has recognized and applied the law of war as including that part of the law of nations which prescribes, for the conduct of war, the status, rights and duties of enemy nations as well as of enemy individuals.”); id. at 29, 63 S.Ct. 2 (describing law of war as “branch of international law”); see also Hamdan, 548 U.S. at 603, 126 S.Ct. 2749 (plurality) (citing Quirin and describing offense alleged therein as being “recognized as an offense against the law of war” both “in this country and internationally”); id. at 610-11, 126 S.Ct. 2749 (analyzing international law sources); id. at 641, 126 S.Ct. 2749 (Kennedy, J., concurring) (“[T]he law of war ... is the body of international law governing armed conflict.” (citing Quiñn, 317 U.S. at 28, 63 S.Ct. 1)); Madsen, 343 U.S. at 354-55, 72 S.Ct. 699 (“The ‘law of war’ ... includes at least that part of the law of nations which defines the powers and duties of belligerent powers occupying enemy territory pending the establishment of civil government.”); Yamashita, 327 U.S. at 12-16, 66 S.Ct. 340 (analyzing international precedent in determining whether offense was violation of law of war); Rogers Op. 37-38 (concluding on de novo review that section 821 refers to international law of war). Several Executive Branch interpretations and scholarly articles also support that reading. See Hamdan II, 696 F.3d at 1248-49 & n. 9 (collecting citations).
On the other hand, section 821 might not be so limited (as two of our colleagues would hold on de novo review). See Brown Op. 52; Kavanaugh Op. 65-68; see also Hamdan, 548 U.S. at 689, 126 S.Ct. 2749 (Thomas, J., dissenting) (“[W]hether an offense is a violation of the law of war cognizable before a military commission must be determined pursuant to the system of common law applied by military tribunals ... [which] is derived from the experience of our wars and our wartime tribunals and the laws and usages of war as understood and practiced by the civilized nations of the world.” (citations and quotation marks omitted)). Significantly, both the Hamdan plurality and dissent relied primarily on domestic precedent to ascertain whether conspiracy could be tried under section 821. See Hamdan, 548 U.S. at 603-09, 126 S.Ct. 2749 (plurality); id. at 689-704, 126 S.Ct. 2749 (Thomas, J., dissenting).[13] There is also language in Yamashita and Quiñn that domestic precedent is an important part of our inquiry. See Yamashita, 327 U.S. at 8, 66 S.Ct. 340 (“[The Congress] adopted the system of military common law applied by military tribunals so far as it should be recognized *24 and deemed applicable by the courts, and as further defined and supplemented by the Hague Convention.... ”); Quirin, 317 U.S. at 31-35, 42 n. 14, 63 S.Ct. 2 (evaluating domestic precedent to determine whether offense charged was law-of-war offense); see also Madsen, 343 U.S. at 347-48, 72 S.Ct. 699. Moreover, as the Supreme Court has explained, when the Congress enacted section 821 and its predecessors, it intended to preserve, not limit, the pre-existing jurisdiction of military commissions. See Madsen, 343 U.S. at 352-53, 72 S.Ct. 699; Yamashita, 327 U.S. at 19-20, 66 S.Ct. 340; see also Hamdan, 548 U.S. at 593, 126 S.Ct. 2749 (majority) (“[T]he Quirin Court recognized that Congress had simply preserved what power, under the Constitution and the common law of war, the President had had before 1916 to convene military commissions-with the express condition that the President and those under his command comply with the law of war.”). It is therefore arguable that the Congress also intended to incorporate military commission precedents predating section 821’s enactment. See Sek-har v. United States, — U.S. -, 133 S.Ct. 2720, 2724, 186 L.Ed.2d 794 (2013) (“[I]f a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it.” (quoting Felix Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L.Rev. 527, 537 (1947))); Lorillard v. Pons, 434 U.S. 575, 581, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978) (“[Wjhere, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute.”).
Ultimately, we need not resolve de novo whether section 821 is limited to the international law of war. It is sufficient for our purpose to say that, at the time of this appeal, the answer to that question is not “obvious.” Olano, 507 U.S. at 734, 113 S.Ct. 1770; see Henderson v. United States, - U.S. -, 133 S.Ct. 1121, 1130-31, 185 L.Ed.2d 85 (2013) (plainness of error determined at time of appeal). As seven justices did in Hamdan, we look to domestic wartime precedent to determine whether conspiracy has been traditionally triable by military commission. That precedent provides sufficient historical pedigree to sustain Bahlul’s conviction on plain-error review.
Most notably, the individuals responsible for the assassination of President Abraham Lincoln were charged with a single offense—“combining, confederating, and conspiring ... to kill and murder ... Abraham Lincoln”—and were convicted of that offense by military commission. General Court-Martial Order No. 356, War Dep’t (July 5, 1865), reprinted in H.R. DOC. NO. 55-314, at 696 (1899).[14] The specification of the offense includes several paragraphs, each of which sets forth a separate overt act done “in further prosecution of the unlawful and traitorous conspiracy.” Id. at 697-98; see also The Assassination of President Linooln and the TRIAL OF THE CONSPIRATORS 18-21 (New York, Moore, Wilstach & Baldwin 1865). A federal district court later denied three of the conspirators’ habeas petitions raising jurisdictional objections to the commission. Ex Parte Mudd, 17 F.Cas. 954 (S.D.Fla.1868).
*25 President Andrew Johnson personally-approved the convictions. In doing so, he considered the jurisdictional limits of military commissions: He asked Attorney General James Speed whether the accused could be tried for conspiracy in a military commission. In a lengthy opinion, Attorney General Speed said they could. See Military Commissions, 11 Op. Att’y Gen. 297 (1865). We think this highest-level Executive Branch deliberation is worthy of respect in construing the law of war. Cf. Sosa v. Alvarez-Machain, 542 U.S. 692, 733-34, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (looking “albeit cautiously” to sources like “controlling executive ... act[s]” to ascertain current state of international law (quoting The Paquete Habana, 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900))); Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 780 n. 6 (D.C.Cir.1984) (Edwards, J., concurring) (Attorney General opinions not binding but “entitled to some deference, especially where judicial decisions construing a statute are lacking”). Granted, the Attorney General’s framing of the question presented—“whether the persons charged with the offence of having assassinated the President can be tried before a military tribunal”—casts some doubt on whether he was addressing inchoate conspiracy or the offense of assassination. 11 Op. Att’y Gen. at 297; see Hamdan, 548 U.S. at 604 n. 35, 126 S.Ct. 2749 (plurality). But the Attorney General’s opinion was written after the commission had been convened and the convictions had been approved; he would therefore have been aware that the sole offense alleged was conspiracy.[15] On the other hand, that the Attorney General’s opinion was written after the convictions were approved may undermine its persuasive value, as it could be viewed as a post hoc rationalization for a decision already made.
Either way, the Lincoln conspirators’ trial was a matter of paramount national importance and attracted intense public scrutiny. Thus, when the Congress enacted section 821’s predecessor—and “preserved what power, under the Constitution and the common law of war, the President had had before 1916 to convene military commissions,” Hamdan, 548 U.S. at 593, 126 S.Ct. 2749 (majority)—it was no doubt familiar with at least one high-profile example of a conspiracy charge tried by a military commission. Because of the national prominence of the case and the highest-level Executive Branch involvement, we view the Lincoln conspirators’ trial as a particularly significant precedent.[16]
*26 Also noteworthy is the World War ll-era military commission trial of several Nazi saboteurs who entered the United States intending to destroy industrial facilities; they were convicted of, inter alia, conspiracy to commit violations of the law of war. See Quirin, 317 U.S. at 21-23, 63 S.Ct. 2. Although the Supreme Court resolved the case on other grounds and therefore did not review the validity of the conspiracy conviction, the case remains another prominent example of a conspiracy charge tried in a law-of-war military commission. President Franklin D. Roosevelt, like President Johnson before him, approved the charges. See 7 Fed.Reg. 5103-02 (July 7, 1942). Moreover, Quirin is not the sole example from that era. See Cole-paugh v. Looney, 235 F.2d 429, 431-32 (10th Cir.1956) (upholding conviction by military commission of Nazi saboteur of conspiracy to commit offense against law of war); General Order (G.O.) No. 52, War Dep’t (July 7, 1945) (President Truman approves convictions of Colepaugh conspirators), reprinted in Supp. Auth. 149-50; Memo, of Law from Tom C. Clark, Assistant Att’y Gen., to Major General Myron C. Kramer, Judge Advocate Gen., at 6 (Mar. 12, 1945), reprinted in Supp. Auth. 139 (opining, with regard to Colepaugh case, that “it may be said to be well established that a conspiracy to commit an offense against the laws of war is itself an offense cognizable by a commission administering military justice”). Finally, during the Korean War, General Douglas MacArthur ordered that persons accused of “conspiracies and agreements to commit ... violations of the laws and customs of war of general application” be tried by military commission. See Letter Order, Gen. HQ, United Nations Command, Tokyo, Japan, Trial of Accused War Criminals (Oct. 28, 1950) (Rules of Criminal Procedure for Military Commissions, Rule 4).
We do not hold that these precedents conclusively establish conspiracy as an offense triable by military commission under section 821. After all, four justices examined the same precedents and found them insufficiently clear. Hamdan, 548 U.S. at 603-09, 126 S.Ct. 2749 (plurality);[17] cf. Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). But there are two differences between Ham-dan and this case. First, the elements of the conspiracy charge were not defined by statute in Hamdan and therefore the plurality sought precedent that was “plain and unambiguous.” 548 U.S. at 602, 126 S.Ct. 2749. Here, the Congress has positively identified conspiracy as a war crime. We need not decide the effect of the Congress’s action, however, because we rely on the second difference: The Hamdan plu *27 rality’s review was de novo; our review is for plain error. We think the historical practice of our wartime tribunals is sufficient to make it not “obvious” that conspiracy was not traditionally triable by law-of-war military commission under section 821. Olano, 507 U.S. at 734, 113 S.Ct. 1770. We therefore conclude that any Ex Post Facto Clause error in trying Bahlul on conspiracy to commit war crimes is not plain. See United States v. Vizcaino, 202 F.3d 345, 348 (D.C.Cir.2000) (assuming error to decide it was not plain).
B. Material Support
A different result obtains, however, regarding Bahlul’s conviction of providing material support for terrorism.[18] The Government concedes that material support is not an international law-of-war offense, see Oral Arg. Tr. 15; Panel Br. of United States 50, 57, and we so held in Hamdan II, 696 F.3d at 1249-53. But, in contrast to conspiracy, the Government offers little domestic precedent to support the notion that material support or a sufficiently analogous offense has historically been triable by military commission. Although Bahlul carries the burden to establish plain error, see United States v. Brown, 508 F.3d 1066, 1071 (D.C.Cir.2007), we presume that in the unique context of the “domestic common law of war”— wherein the Executive Branch shapes the relevant precedent and individuals in its employ serve as prosecutor, judge and jury—the Government can be expected to direct us to the strongest historical precedents. What the Government puts forth is inadequate.
The Government relies solely on a number of Civil War-era field orders approving military commission convictions of various offenses that, the Government contends, are analogous to material support. Before delving into the specifics of the orders, we note our skepticism that such informal field precedent can serve as the sole basis for concluding that a particular offense is triable by a law-of-war military commission. Unlike the Lincoln conspirators’ and Nazi saboteurs’ cases, which attracted national attention and reflected the deliberations of highest-level Executive Branch officials, the field precedents are terse recordings of drumhead justice executed on or near the battlefield. Indeed, several precedents cited by the Government for trying material support and solicitation under the “law of war” were issued by the same 1862 military commission that tried one Henry Willing for the offense of “[b]eing a bad and dangerous man.” G.O. No. 19, HQ, Dep’t of the Mississippi (Apr. 24, 1862), 1 The Wae of the Rebellion, Official ReooRds of the Union and ConfedeRate Abmies (OR) ser. II, at 480-81. In addition, the military commissions these orders memorialize were not always models of due process.[19] *28 And, as the Hamdan plurality explained, the Civil War commissions “operated as both martial law or military government tribunals and law-of-war commissions,” obliging us to treat the precedents “with caution” because of their unclear jurisdictional basis. 548 U.S. at 596 n. 27, 126 S.Ct. 2749 (plurality); see also id. at 608, 126 S.Ct. 2749.[20]
In any event, even if the law of war can be derived from field precedents alone, none of the cited orders charges the precise offense alleged here—providing material support for terrorism. The Government nonetheless contends that the material support charge “prohibits the same conduct, under a modern label, as the traditional offense of joining with or providing aid to guerrillas and other unlawful belligerents.” E.B. Br. of United States 48. But we do not think the cited field orders establish that such conduct was tried by law-of-war military commissions during the Civil War.[21]
First, every precedent cited by the Government involves offenses committed in Missouri, a border state; none is from a state that seceded. See Dow v. Johnson, 100 U.S. 158, 164-65, 25 L.Ed. 632 (1879) (observing that, during the Civil War, “[t]he people of the loyal States ... and the people of the Confederate States ... became enemies to each other, and ... [cjommercial intercourse and correspondence between them were prohibited ... by the accepted doctrines of public law”); McKinzie v. Hill, 51 Mo. 303, 307 (1873) (“[T]he principles [regarding the duty of “total non-intercourse between the belligerents”] have no application to the present case. Missouri was not one of the States that joined in the rebellion.”). The difference between a border state—whose citizens owed a duty of loyalty to the United States—and a state that seceded—whose citizens did not—is significant. The crime of “aiding the enemy,” which includes as an element the breach of a duty of loyalty owed to the United States, had long been triable by military commission. See Ham-dan II, 696 F.3d at 1245 n. 4 (citing Ham-dan, 548 U.S. at 600-01 n. 32, 126 S.Ct. 2749 (plurality)); Winthrop, MilitaRY Law AND PRECEDENTS, SUpTO, at 839-40 (“of-fences in violation of the laws and usages of war” subject to trial by law-of-war military commission include “breaches of the law of non-intercourse with the enemy, such as ... furnishing them with money, arms, provisions, medicines, & c”); see also 10 U.S.C. § 950v(b)(26) (2006) (codifying offense of aiding enemy to include element of “breach of an allegiance or duty to the United States”). The orders cited by the Government frequently refer to the treasonous nature of the conduct, implying a breach of loyalty. See, e.g., G.O. No. 9, HQ, Dep’t of the Mississippi (Mar. 25, 1862), 1 OR ser. II, at 465-66 (case of John Montgomery); id. at 467 (case of Joseph Bollinger); G.O. No. 1, HQ, Dep’t of the Missouri (Jan. 1, 1862), 1 OR ser. II, at 248 (“[Cjertain acts of a treasonable character such as conveying information to the enemy, acting as spies, & c., are military offenses triable by military tribunals and punishable by military authority.”); see also Young v. United States, 97 U.S. 39, 62, 24 L.Ed. 992 (1877) (“[T]reason is a *29 breach of allegiance, and can be committed by him only who owes allegiance_” (quotation marks omitted)). The material support offense charged here, which lacks a breach of loyalty requirement, is plainly distinguishable from the “aiding the enemy” precedent.
Second, several of the cited field orders appear to involve offenses more akin to aiding and abetting a law-of-war violation. See, e.g., G.O. No. 19, HQ, Dep’t of the Mississippi (Apr. 24, 1862), 1 OR ser. II, at 478 (Matthew Thompson convicted of “joining with, aiding and assisting [a] band [of desperadoes] in the commission of acts of plunder, robbery and abuse of the citizens of the State of Missouri”). Aiding and abetting is a theory of criminal liability, not a stand-alone offense like material support. See Ali, 718 F.3d at 936. As the Court said in Hamdan II, “aiding and abetting terrorism prohibits different conduct, imposes different mens rea requirements, and entails different causation standards than material support for terrorism.” 696 F.3d at 1252. Thus, “[i]f the Government wanted to charge [Bahlul] with aiding and abetting terrorism ... it should have done so.” Id.; see 10 U.S.C. § 950q(l) (2006) (one who “aids [or] abets” offense proscribed by 2006 MCA is punishable as principal).
Third, other orders appear to involve the offense of unlawful belligerency—that is, directly waging guerrilla warfare. See, e.g., G.O. No. 15, HQ, Dep’t of the Mississippi (Apr. 3, 1862), 1 OR ser. II, at 472-476 (approving convictions of several men who each, not “being a soldier belonging to any lawfully authorized and organized military forces at war with the United States,” “t[ook] up arms as an insurgent and committed] acts of hostility against” United States military forces); G.O. No. 9, HQ, Dep’t of the Mississippi (Mar. 25, 1862), 1 OR ser. II, at 464-65 (William Kirk convicted of “belonging] to a marauding or guerrilla band” that “did unlawfully plunder and take away a certain yoke of oxen, wagon and other property”); see also Instructions for the Government of Armies of the United States in the Field, G.O. No. 100, art. 82 (Apr. 24, 1863); Winthrop, MilitaRY Law and Precedents, supra, at 840.
The upshot is that the Civil War field precedent is too distinguishable and imprecise to provide the sole basis for concluding that providing material support for terrorism was triable by law-of-war military commission at the time of Bahlul’s conduct.[22] We therefore think it was a plain ex post facto violation—again, assuming without deciding that the protection of the Ex Post Facto Clause extends to Bah-lul, see supra pp. 17-18—to try Bahlul by military commission for that new offense. See Collins, 497 U.S. at 42-43, 110 S.Ct. 2715. The error is prejudicial and we exercise our discretion to correct it by vacating Bahlul’s material support conviction. Olano, 507 U.S. at 734-36, 113 S.Ct. 1770; see also Casey, 343 U.S. at 808, 72 S.Ct. 999 (vacating conviction based on Government’s confession of error); United *30 States v. Law, 528 F.3d 888, 909 (D.C.Cir. 2008) (same); cf. Petite, 361 U.S. at 531, 80 S.Ct. 450 (vacating conviction based on Government’s motion).[23]
C. Solicitation
We also conclude that solicitation of others to commit war crimes is plainly not an offense traditionally triable by military commission.[24] The Government concedes it is not an international law-of-war offense. See Oral Arg. Tr. 15; Panel Br. of United States 50, 57. The Government contends that solicitation “possesses a venerable lineage as an offense triable by military commission,” E.B. Br. of United States 50, but it cites only two Civil War-era field orders involving three defendants in support thereof. It mischaracterizes one of the orders, asserting that “a military commission convicted Francis Skinner of ‘counsel[ing]’ and ‘invit[mg]’ others to destroy a railroad in violation of the law of war,” id., when in fact Skinner was acquitted of that offense. See G.O. No. 19, HQ, Dep’t of the Mississippi (Apr. 24, 1862), 1 OR ser. II, at 476-77. And although the other two defendants in the cited cases were convicted on charges that resemble the 2006 MCA solicitation offense, they were also convicted of personal involvement in the crimes they solicited. See id. at 478 (James Barnes convicted of both “attack[ing] the dwelling-house of one Thomas H. Keene ... and with guns and pistols attempting] to murder the occupants of said house” and “inciting] certain persons unknown to make” that attack); G.O. No. 15, HQ, Dep’t of the Mississippi (Apr. 3, 1862), 1 OR ser. II, at 475 (Edward Wingfield convicted of both “assisting] and abet[ting] the said persons in the destruction of the track, bridges and buildings of the [North Missouri Railroad]” and “inciting], inducing] and procuring] the said persons to take up arms and to commit acts of hostility against the property of the United States”); cf. Ham-dan, 548 U.S. at 609, 126 S.Ct. 2749 (plurality).
As noted, we are skeptical that field orders can be the sole basis for military commission jurisdiction over a particular offense. See supra p. 27. Moreover, the two field orders discussed fall far short of meeting any showing we would require. Because solicitation to commit war crimes was not an offense triable by law-of-war military commission when Bahlul’s conduct occurred, it is a plain ex post facto violation—again, assuming without deciding that the protection of the Ex Post Facto Clause extends to Bahlul, see supra pp. 17-18—to try him by military commission for that new offense. See Collins, 497 U.S. *31 at 42-43, 110 S.Ct. 2715. The error is prejudicial and we exercise our discretion to correct it by vacating Bahlul’s solicitation conviction. Olano, 507 U.S. at 734-736, 113 S.Ct. 1770; see also Casey, 343 U.S. at 808, 72 S.Ct. 999; Law, 528 F.3d at 909; cf. Petite, 361 U.S. at 531, 80 S.Ct. 450.[25]
V. Remaining Issues
In his brief to the panel, Bahlul raised four challenges to his convictions that we have not addressed here. He argued that (1) the Congress exceeded its Article I, § 8 authority by defining crimes triable by military commission that are not offenses under the international law of war, see Br. for Bahlul 38, Bahlul v. United States, No. 11-1324 (D.C.Cir. Mar. 9, 2012); (2) the Congress violated Article III by vesting military commissions with jurisdiction to try crimes that are not offenses under the international law of war, see id. at 39-40; (3) his convictions violate the First Amendment, see id. at 43; and (4) the 2006 MCA discriminates against aliens in violation of the equal protection component of the Due Process Clause, see id. at 54. We intended neither the en banc briefing nor argument to address these four issues. See Order, Bahlul v. United States, No. 11-1324 (D.C.Cir. May 2, 2013) (notifying parties that Equal Protection and First Amendment issues are not “within the scope of the rehearing en banc”). And with the exception of a few passages regarding the first two, we received none from the parties. We therefore remand the case to the original panel of this Court to dispose of Bahlul’s remaining challenges to his conspiracy conviction. See United States v. McCoy, 313 F.3d 561, 562 (D.C.Cir.2002) (en banc) (remanding outstanding issue to panel).
For the foregoing reasons, we reject Bahlul’s ex post facto challenge to his conspiracy conviction and remand that conviction to the panel to consider his alternative challenges thereto. In addition, we vacate Bahlul’s convictions of providing material support for terrorism and solicitation of others to commit war crimes, and, after panel consideration, remand to the CMCR to determine the effect, if any, of the two vacaturs on sentencing.

So ordered.

. The Military Commissions Act of 2009 rewrote the 2006 MCA but left it substantively unaltered as relevant here. See National Defense Authorization Act for Fiscal Year 2010, Pub.L. No. 111-84, §§ 1801-07, 123 Stat. 2190, 2574-2614 (codified at 10 U.S.C. §§ 948a-950t (Supp. Ill 2010)). Unless otherwise noted, we refer to the 2006 MCA.

. The military commission specifically found that Bahlul committed the following overt acts: (1) traveled to Afghanistan with the purpose and intent of joining al Qaeda; (2) met with Saif al Adi, the head of the al Qaeda Security Committee, as a step toward joining al Qaeda; (3) underwent military-type training at an al Qaeda sponsored training camp located in Afghanistan; (4) pledged fealty or "bayat” to the leader of al Qaeda, Osama bin Laden, joined al Qaeda and provided personal services in support of al Qaeda; (5) prepared and assisted in the preparation of various propaganda products, including the video "The Destruction of the American Destroyer U.S.S. Cole,” to solicit material support for al Qaeda, to recruit to and indoctrinate personnel about the organization and objectives of al Qaeda and to solicit, incite and advise persons to commit terrorism; (6) acted as personal secretary and media secretary of bin Laden in support of al Qaeda; (7) arranged for Mohamed Atta and Ziad al Jarrah to pledge fealty or "bayat” to bin Laden; (8) prepared the propaganda declarations styled as martyr wills of Atta and al Jarrah in preparation for the acts of terrorism perpetrated by Atta, al Jarrah and others at various locations in the United States on September 11, 2001; (9) at the direction of bin Laden, researched the economic effect of the 9/11 attacks on the United States and provided the results of that research to bin Laden; and (10) operated and maintained data processing equipment and media communications equipment for the benefit of bin Laden and other members of the al Qaeda leadership. App. 132-33; see also id. at 122-23 (charging document).

. Under the 2006 MCA, a military commission "may be convened by the Secretary of Defense or by any officer or official of the United States designated by the Secretary for that purpose.” 10 U.S.C. § 948h. Crawford, a former judge of the United States Court of Appeals for the Armed Forces, was so designated by the Defense Secretary. The convening authority refers the charges against the accused for trial by military commission, details the members of the commission and approves or disapproves the findings and sentence of the commission. Id. §§ 948i(b), 950b; cf. Hamdan, 548 U.S. at 647-49, 126 S.Ct. 2749 (Kennedy, J., concurring) (explaining role of convening authority under UCMJ).

. We need not decide whether Rule 52(b) applies directly to this proceeding because plain-error review is appropriate whether or not Rule 52(b) directly governs. See Salazar, 602 F.3d at 437.

. The Government argued for plain-error review before the CMCR, in its original brief to a panel of this Court and in its brief to the en banc court. See Bahlul, 820 F.Supp.2d at 1256-58; Br. of the United States 65, Bahlul v. United States, No. 11-1324 (D.C.Cir. May 16, 2012) (Panel Br.); Br. of the United States 63, Bahlul v. United States, No. 11-1324 (D.C.Cir. July 10, 2013) (E.B.Br.). We reject Bahlul's contention that the Government abandoned its forfeiture argument by conceding in its supplemental brief to the panel after Hamdan II that Bahlul’s convictions should be vacated. That brief was directed to a panel of this Court, which was bound by Hamdan II 's avoidance of the ex post facto issue. See Hamdan II, 696 F.3d at 1248 n. 7. Only at the en banc stage was it possible for the Government to attack Hamdan II ’s statutory construction and therefore put the Ex Post Facto Clause—and the applicable standard of review'—back in play.

. Three of our colleagues cite Rules 905 and 907 of the Rules of Military Commissions for the notion that Bahlul’s ex post facto argument is "not forfeitable.” Opinion of Judge Kavanaugh (Kavanaugh Op.) 78; accord Opinion of Judge Rogers (Rogers Op.) 48-49; Opinion of Judge Brown (Brown Op.) 51. Bahlul's briefs do not mention these rules or suggest this argument. Moreover, Rules 905 and 907 both explicitly refer to waiver, see Manual for Military Commissions, pt. II, at 83-84, 87 (2007), whereas we conclude instead that Bahlul forfeited his argument. "Although jurists often use the words interchangeably,” Kontrick v. Ryan, 540 U.S. 443, 458 n. 13, 124 S.Ct. 906, 157 L.Ed.2d 867 (2004), waiver and forfeiture are not the same, see Olano, 507 U.S. at 733, 113 S.Ct. 1770; see also United States v. Weathers, 186 F.3d 948, 955 (D.C.Cir. 1999) (explaining difference while interpreting similar provision in Federal Rules of Criminal Procedure regarding waiver of pretrial motions). Nor is Bah-lul’s ex post facto argument "jurisdictional.” See Rogers Op. 48; Brown Op. 51; Kava-naugh Op. 78. As discussed infra pp. 12-13, the 2006 MCA explicitly confers jurisdiction on military commissions to try the charged offenses. The question whether that Act is unconstitutional does not involve " ‘the courts’ statutory or constitutional power to adjudicate the case.' ” United States v. Cotton, 535 U.S. 625, 630, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002) (quoting Steel Co. v. Citizens for a Better Env’t, 523 U.S. 83, 89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)); United States v. Williams, 341 U.S. 58, 66, 71 S.Ct. 595, 95 L.Ed. 747 (1951) ("Even the unconstitutionality of the statute under which the proceeding is brought does not oust a court of jurisdiction.”); Lamar v. United States, 240 U.S. 60, 65, 36 S.Ct. 255, 60 L.Ed. 526 (1916) ("The objection that the indictment does not charge a crime against the United States goes only to the merits of the case."); see also United States v. Delgado-Garcia, 374 F.3d 1337, 1342-43 (D.C.Cir.2004) (explaining limits of so-called "Blackledge/Menna ” exception relied on by Bahlul). Nor are we persuaded that Bahlul’s ex post facto argument is non-forfeitable because it amounts to an argument that the indictment fails to "allege an offense.” Rogers Op. 48; Kavanaugh Op. 79. Failure to state an offense is simply another way of saying there is a defect in the indictment—as evidenced by Rule 907’s cross-reference to Rule 307(c), which sets forth the criteria for charges and specifications. See Manual for Military Commissions, pt. II, at 15-16; see also Delgado-Garcia, 374 F.3d at 1341-42 (”[T]he question of an indictment’s failure to state an offense is an issue that goes to the merits of a case....”). As Cotton makes clear, such a claim can be forfeited. 535 U.S. at 630-31, 122 S.Ct. 1781.

. Although perhaps uncommon, overruling our precedent on plain-error review is within the authority of the en banc court. See, e.g., *12 United States v. Padilla, 415 F.3d 211, 217-18 (1st Cir.2005) (en banc) (recognizing power of en banc court to overrule circuit precedent under plain-error review but declining to do so).

. The legislative history is overwhelmingly in favor of retroactive application of the MCA’s provisions as a response to Hamdan. See, e.g., 152 Cong. Rec. H7533 (daily ed. Sept. 27, 2006) (statement of Rep. Hunter) ("I can't think of a better way to honor the fifth anniversary of September 11 than by establishing a system to prosecute the terrorists who on that day murdered thousands of innocent civilians _”); id. ("Without [the 2006 MCA], the United States has no effective means to try and punish the perpetrators of September 11, the attack on the USS Cole and the embassy bombings.”); id. at H7536 (statement of Rep. Saxton) ("We have carefully narrowed and crafted the provisions of this bill to enable the United States to prosecute the perpetrators of the 1998 bombings of the American embassies in Kenya and Tanzania, the 2000 attack on the USS Cole, and other crimes that have been committed.”); id. ("Importantly, this bill allows, as all Americans believe it should, the criminal prosecutions of those who purposefully and materially supported [the 9/11 conspiracy].”); id. at H7545 (statement of Rep. Sensenbrenner) ("[The 2006 MCA] is about prosecuting the most dangerous terrorists America has ever confronted ... like Khalid Sheik Mohamed, the mastermind of the 9/11 attacks, or Ahbd al-Nashiri, who planned the attack on the USS Cole.”); id. at H7552 (statement of Rep. Boehner); id. at S10243 (statement of Sen. Frist) ("Until Congress passes [the 2006 MCA], terrorists such as Khalid Shaikh Mohamed cannot be tried for war crimes .... ”); cf. id. at H7536 (statement of Rep. Skelton) (opposing 2006 MCA because it “creates” "ex post facto laws”).

. Were we to decide this issue de novo, Judge Henderson would conclude that the Ex Post Facto Clause does not apply in cases involving aliens detained at Guantanamo, for the reasons stated in her separate concurring opinion. Chief Judge Garland and Judges Tatel and Griffith would conclude that the Clause does apply in such cases, for the reasons stated in the first two paragraphs of Part II.B of Judge Rogers's opinion and in Note 3 of Judge Kavanaugh’s opinion.

. Specifically, the 2006 MCA provides: “Any person subject to this chapter who conspires to commit one or more substantive offenses triable by military commission under this chapter, and who knowingly does any overt act to effect the object of the conspiracy, shall be punished....” 10 U.S.C. § 950v(b)(28). The murder of protected persons is the "intentional! ]” killing of one or more "protected persons.” Id. § 950v(b)(l). A protected person is "any person entitled to protection under one or more of the Geneva Conventions, including ... civilians not taking an active part in hostilities.” Id. § 950v(a)(2)(A).

. Likewise, the greater maximum sentence provided in the 2006 MCA—the death penalty, as opposed to a maximum of life imprisonment under section 2332(b)—does not present an ex post facto problem. The Government did not seek the death penalty, see Trial Tr. 958, and the military judge's instructions to the commission before sentencing specifically declared that "[t]he maximum punishment that may be adjudged in this case is confinement for life,” id. at 949. Further, the 2006 MCA requires a 12-member military commission if the death penalty is sought, see 10 U.S.C. § 949m(c), and Bahlul’s commission had only nine members, see Trial Tr. 285. There was therefore no risk that the greater sentence included in the 2006 MCA affected Bahlul's sentence. See Peugh, 133 S.Ct. at 2082 ("The touchstone of this Court's inquiry is whether a given change in law presents a sufficient risk of increasing the measure of punishment attached to the covered crimes.” (quotation marks omitted)).

. To be clear, Bahlul was convicted of conspiracy as a stand-alone offense that does not depend upon the completion of an object offense. See Trial Tr. 848. He was not charged with conspiracy as a theory of liability for a completed crime. See Trial Tr. 109-12 (Government amended charge by striking allegation that Bahlul joined "an enterprise of persons who share the common criminal purpose that involved ... the commission ... of one or more substantive offenses”); see also United States v. Ali, 718 F.3d 929, 941 (D.C.Cir. 2013) (noting difference between conspiracy as stand-alone offense and conspiracy as theory of liability).

. The Hamdan plurality did not expressly decide whether section 821's reference to the "law of war” is limited to the international law of war. See Hamdan, 548 U.S. at 604-13, 126 S.Ct. 2749 (plurality).

. The Hamdan plurality interpreted this precedent as convicting the conspirators only of the completed offense of assassination, not inchoate conspiracy. Hamdan, 548 U.S. at 604 n. 35, 126 S.Ct. 2749 (plurality). But see id. at 699 n. 12, 126 S.Ct. 2749 (Thomas, J., dissenting) (finding it clear that inchoate conspiracy was tried).

. Some doubt about the precise nature of the charge also appears in the transcript of the conspirators' trial. Thomas Ewing, counsel for several of the defendants, objected to the ambiguity of the charge, stating that “[tjhere is but one charge, in form, against the accused; but, in fact, there seem to be four charges, each alleging the commission of a separate and distinct offense.” The Assassination of President Lincoln and the Trial of the Conspirators, supra, at 244. He listed what he perceived to be the four offenses charged: conspiracy, traitorously murdering President Lincoln, traitorously assaulting with intent to kill Secretary of State William Seward and lying in wait with intent to traitorously murder then-Vice President Johnson. Id. at 244— 45. The Judge Advocate responded that "[t]he general allegation is a conspiracy” and that ”[t]he pleadings proceed, after averring this conspiracy, ... to set forth clearly and specifically the part which it is believed and alleged each one of them took in the execution of that conspiracy.” Id. at 245; see also id. at 246-47 (further discussion of the charge).

. William Winthrop—the Blackstone of military law—also concluded that conspiracy is an offense that is "both a crime against society and a violation of the laws of war.” Winthrop, Military Law and Precedents, supra, at 842; accord William Winthrop, A Digest of Opinions of the Judge Advocate General of the Army 328-29 (1880) ("[cjonspiracy by two or *26 more to violate the laws of war by destroying life or property in aid of the enemy” is an "offencef ] against the laws and usages of war”). That said, although Winthrop based that conclusion in part on the Lincoln conspirators’ case, he also relied on Civil War-era field orders. Winthrop, Military Law and Precedents, supra, at 839 & n. 5 (explaining different bases of military jurisdiction and citing cases of Henry Wirz, William Murphy, G. St. Leger Grenfel and others as examples of criminal conspiracies tried by military commission on combination of jurisdictional bases). The field orders lack the high-level Executive Branch consultation of the Lincoln conspirators' case, however, and give us pause for additional reasons discussed infra p. 27.

. The Hamdan plurality thought Quirin suggested "that conspiracy is not a violation of the law of war” because the Court's "analysis ... placed special emphasis on the completion of [another charged] offense; it took seriously the saboteurs' argument that there can be no violation of a law of war—at least not one triable by militaiy commission—without the actual commission of ... a 'hostile and warlike act.’ ” 548 U.S. at 606-07, 126 S.Ct. 2749 (plurality).

. The 2006 MCA provides: "Any person subject to this chapter who provides material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, an act of terrorism ..., or who intentionally provides material support or resources to an international terrorist organization engaged in hostilities against the United States, knowing that such organization has engaged or engages in terrorism ..., shall be punished....” 10 U.S.C. § 950v(b)(25). The provision cross-references the Act’s prohibition of "terrorism,” which is defined as an act that “kills or inflicts great bodily harm on one or more protected persons, or ... that evinces a wanton disregard for human life, in a manner calculated to influence or affect the conduct of government or civilian population by intimidation or coercion, or to retaliate against government conduct.” Id. § 950v(b)(24).

. See Frank J. Williams & Nicole J. Benjamin, Military Trials of Terrorists: From the Lincoln Conspirators to the Guantanamo Inmates, 39 N. Ky. L.Rev. 609, 625 (2012); *28 David Glazier, Precedents Lost: The Neglected History of the Military Commission, 46 Va. J. Int’l L. 5, 39-40 (2005).

. See also Hamdan, 548 U.S. at 602 n. 34, 126 S.Ct. 2749 (plurality) (explaining that because of "vagueness” concerns, "caution ... must be exercised in the incremental development of common-law crimes”); Hamdan II, 696 F.3d at 1250 n. 10 (similar).

. In reviewing this Civil War precedent, we hold only that it does not sanction trying material support by military commission.

. Even the Government is dubious of its argument: Executive Branch officials previously acknowledged in prepared congressional testimony that "there are serious questions as to whether material support for terrorism or terrorist groups is a traditional violation of the law of war.” Legal Issues Regarding Military Commissions and the Trial of Detainees for Violations of the Law of War: Hearing Before the S. Comm, on Armed Services, 111th Cong. 12 (2009) (statement of David Kris, Assistant Attorney General, National Security Division, Department of Justice); see also id. at 9 (statement of Jeh Johnson, General Counsel, Department of Defense) (“After careful study, the administration has concluded that appellate courts may find that 'material support for terrorism’—an offense that is also found in Title 18—is not a traditional violation of the law of war.”).

. Unlike with conspiracy, the Government has not identified a pre-existing federal criminal statute that might cure any ex post facto aspect of Bahlul’s material support conviction. The Government cites 18 U.S.C. § 2339A, which criminalizes providing material support or resources knowing they are to be used in a violation of section 2332, but that offense was not made extraterritorial until October 26, 2001. See Pub.L. No. 107-56, § 805(a)(1)(A), 115 Stat. 272, 377. Although Bahlul was not captured until December 2001, nearly all of the conduct of which he was convicted took place before September 11, 2001. The only overt act that necessarily occurred after September 11 was Bahlul’s research on the economic effects of the attack. The record does not reflect, however, whether Bahlul committed that or any other act of material support constituting a violation of section 2339A after October 26, 2001. This charge, then, is unlike the conspiracy charge, where Bahlul expressly conceded and the jury necessarily found the two omitted elements.

. The 2006 MCA provides: "Any person subject to this chapter who solicits or advises another or others to commit one or more substantive offenses triable by military commission under this chapter shall ... be punished....” 10 U.S.C. § 950u.

. As with material support, we cannot conclude that a preexisting federal statute might cure any ex post facto aspect of Bahlul's solicitation conviction. The Government notes that, when Bahlul's conduct occurred, 18 U.S.C. § 373 criminalized solicitation of another person to "engage in conduct constituting a felony that has as an element the use, attempted use, or threatened use of physical force against property or against the person of another.” The Government’s brief does not identify an offense that Bahlul solicited, however, which it must do for us to compare the elements of a pre-existing criminal offense with the elements of the charge under the MCA.