KAVANAUGH, Circuit Judge,
with whom Circuit Judges BROWN and GRIFFITH join, concurring:
Pursuant to congressional authorization, Presidents throughout U.S. history have employed military commissions to try enemy war criminals for conspiracy to commit war crimes. That history includes the two most significant U.S. military commission trials: the 1865 military commission trial of the Confederate conspirators who plotted to kill President Lincoln and the 1942 military commission trial of the Nazi conspirators who secretly entered the United States during World War II and planned to attack U.S. infrastructure and military facilities.
In the wake of al Qaeda’s attacks on the United States on September 11, 2001, Congress has twice passed laws (signed by President Bush in 2006 and President Obama in 2009) expressly reaffirming that military commissions may try unlawful enemy combatants for conspiracy to commit war crimes. Pursuant to those express congressional authorizations, President Bush and later President Obama have employed military commissions to try alleged al Qaeda war criminals for the offense of conspiracy to commit war ■ crimes. Indeed, Khalid Sheikh Mohammad, one of the alleged masterminds of the September 11th attacks, faces a conspiracy charge in his pending military commission trial. Several other al Qaeda members likewise have been charged 'with conspiracy before U.S, military commissions.
Bahlul is an al Qaeda member who worked closely with Osama bin Laden in plotting al Qaeda’s September 11th attacks on the United States. In December 2001, Bahlul was captured in Pakistan. In 2008, he was tried and convicted before a U.S. military commission of conspiracy to commit war crimes.
Citing Article I and Article III of the Constitution, Bahlul argues that Congress may establish military commissions only for offenses under the international law of war. Bahlul.further argues (and the Government concedes) that conspiracy is not an offense under the international law of war. Therefore, Bahlul contends that he may not be tried for conspiracy before a U.S. military comihission.
On its face, Bahlul’s argument is extraordinary. It would incorporate international law into the U.S. Constitution as a judicially enforceable constraint on Congress and the President. As a matter, of U.S. constitutional law, the wartime decisions of Congress and the President to try unlawful enemy combatants before military commissions would be subject to the dictates of foreign nations and the international community, as embodied in international law.
The Government responds that, under the Constitution, Congress may establish military commissions to try, at a minimum, (i) international law of war offenses and (ii) offenses that are not international law *760 of war offenses but have historically been tried by U.S. military commissions. As the Government points out, conspiracy has historically been tried by U.S. military commissions.
This case therefore raises one central legal question: Under the U.S. Constitution, may Congress establish military commissions to try unlawful enemy combatants for the offense of conspiracy to commit war crimes, even if conspiracy is not an offense under the international law of war? The answer is yes. We know that from the text and original understanding of the Constitution; the structure of the Constitution; landmark Supreme Court precedent; longstanding congressional practice, as reflected in venerable and contemporary federal statutes; and deeply rooted, Executive Branch practice, from the 1800s to the present.[1]
I
We first address the Article I issue. Bahlul acknowledges that Congress possesses authority under Article I to establish military commissions to try war crimes. But he contends that military commissions may try only international law of war offenses. Bahlul further argues (and the Government concedes) that conspiracy is not an international law of war offense. Therefore, Bahlul says he may not be tried by military commission for conspiracy.
Contrary to Bahlul’s argument, Article I of the Constitution does not impose international law as a limit on Congress’s authority to make offenses triable by military commission.[2] That is apparent from five *761 sources of law: the text and original understanding of Article I, the overall structure of the Constitution, landmark Supreme Court precedent, longstanding, federal statutes, and deeply rooted U.S. military commission practice.
First, the text and original understanding of Article I demonstrate that international law does not impose a limit on Congress’s authority to make offenses triable by military commission.
The premise of Bahlul’s Article I argument is that Congress’s sole source of constitutional authority to make offenses triable by military commission is the Define and Punish Clause of Article I. That Clause grants Congress authority to “define and punish ... Offences against the Law of Nations.” U.S. Const, art. I, § 8, cl. 10. Bahlul argues that the “law of nations” is a synonym for international law, and further contends that conspiracy is not an offense under the international law of war. Therefore, according to Bahlul, Congress lacks power under Article I, Section 8 to make conspiracy an offense triable by military commission.
We need not decide the scope of the Define and Punish Clause in this case.[3] That is because the premise of Bahlul’s Article I argument is flawed. Regardless of the scope of the Define and Punish Clause, an issue we do not decide, Congress’s Article I authority to establish military commissions—including its authority to determine which crimes may be tried by military commission—does not derive exclusively from that Clause.
Rather, the war powers clauses in Article I, Section 8—including the Declare War Clause and the Captures Clause, together with the Necessary and Proper Clause—supply Congress with ample authority to establish military commissions and make offenses triable by military commission. And the Declare War Clause and the other war powers clauses in Article I do not refer to international law or otherwise impose international law as a constraint on Congress’s authority to make offenses, triable by military commission. Cf. Al Bahlul v. United States, 792 F.3d 1, 55-56 (D.C. Cir. 2015) (Henderson, J., dissenting).
As the Supreme Court has long recognized, a congressional authorization of war pursuant to the Declare War Clause is understood “by universal agreement and practice” to encompass all of the traditional incidents of war—including the power to kill, capture, and detain enemy combatants, and most relevant here, the power to try unlawful enemy combatants by military commission for war crimes. Hamdi v. Rumsfeld, 542 U.S. 507, 518, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (binding opinion of O’Connor, J.); see also Hamdan v. Rumsfeld, 548 U.S. 557, 593-94, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006); In re Yamashita, 327 U.S. 1, 11-12, 66 S.Ct. 340, 90 L.Ed. 499 (1946).[4] As Colonel William Winthrop, described by the Supreme Court as *762 the “Blackstone of Military Law,” Reid v. Covert, 354 U.S. 1, 19 n.38, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (plurality opinion), summarized it: “[I]n general, it is those provisions of the Constitution which empower Congress to ‘declare war’ and ‘raise armies,’ and which, in authorizing the initiation of war, authorize the employment of all necessary and proper agencies for its due prosecution, from which this tribunal derives its original sanction-The commission is simply an instrumentality for the more efficient execution of the war powers vested in Congress and the power vested in the President as Commander-in-chief in war.” William Winthrop, Military Law and Precedents 831 (rev. 2d ed. 1920); see also Hamdan, 548 U.S. at 592 n.21, 126 S.Ct. 2749 (quoting Winthrop’s statement that the Declare War Clause, among others, supplies Congress with authority to establish military commissions to try war crimes). So too, Justice Story explained that Congress’s power to make substantive and procedural rules for military commissions is a “natural incident to the preceding powers, to make war, to raise armies, and to provide and maintain a navy.” 3 Joseph Story, Commentaries on the Constitution of the United States § 1192 (1833).[5]
In short, it would be textually and historically inaccurate to deem the Defíne and Punish Clause, whatever its scope, as the sole source of Congress’s authority here. The Declare War Clause and the other war powers clauses in Article I authorize Congress to establish military commissions and make offenses triable by military commission. And those clauses do not refer to international law or otherwise impose international law as a constraint on Congress’s - authority to make offenses triable by military commission. By their terms, therefore, those clauses do: not confine U.S. military commissions to trying only international law of war offenses.
Second, the overall structure of the Constitution strongly reinforces the conclusion that international law does not impose' a limit on Congress’s authority to make offenses triable by military commission.
The Framers of the Constitution paid careful attention to the allocation of war powers between the national government and the states, and within the national government. The Framers assigned the national government—in particular, Congress and the President—the authority to make wartime decisions oh behalf of the United States. The Framers assigned that power to the national government in part because the inability to wage war effectively had been one of the key weaknesses of the Articles of Confederation, and the Framers sought to fix that flaw.
What matters most for present purposes is that the Framers certainly did not purr port to afford foreign nations (acting through the international law of war or otherwise) any constitutional authority over the wartime decisions of the United States, such as the determination of which war crimes may be prosecuted by U.S. military commissions. It would be a historical anomaly to conclude that. “We the People of the United States” gave foreign or international bodies the power to constrain U.S. war-making authority in , that way. Yet that would be the necessary consequence of the argument put forward by Bahlul and the joint dissent. They would *763 incorporate -international law into the U.S. Constitution as- a judicially enforceable constraint on the wartime decisions of the Congress and the President. As a matter of U.S. constitutional law, Congress and the President would be subject to the dictates of the international community, a community that at any given time may be unsupportive of or even hostile to U.S. national security interests.
Put simply, the argument advanced by Bahlul and the joint dissent does not comport with the Constitution’s structure. The Constitution does not give foreign nations (acting through the international law of war or otherwise) a de facto veto over Congress’s determination of which war crimes may be tried by U.S. military commissions.
Third, consistent with the Constitution’s text and structure, landmark Supreme Court precedent likewise supports the conclusion that Congress’s authority to establish offenses triable by military commission is not confined by international law.
The Supreme Court’s leading constitutional decision regarding military commissions is Ex Parte Quirin. There, the Supreme Court ruled that use of military commissions to try war crimes was constitutionally permissible. In doing so, the Court emphasized that U.S. military commissions have long been authorized by Congress, and the Court noted -in particular that military commissions have long tried the offense of spying. See Ex Parte Quinn, 317 U.S. 1, 41-42 & n.14, 63 S.Ct. 2, 87 L.Ed. 3 (1942). But spying was not and has never been an offense under the international law of war. See Government Br. 45 (spying not an international law of war offense); see also National Institute of Military Justice Amicus Br. 14-15 n.6 (same); Curtis A. Bradley & Jack L. Goldsmith, Congressional Authorization and the War on Terrorism, 118 Harv. L. Rev. 2047, 2132 (2005) (same). The Court nonetheless relied on and approved of trying spying offenses by military commission.[6] Quirin is admittedly a difficult decision to decipher. But the Supreme Court’s reliance on spying, a non-international-law-of-war offense, as an offense triable by military commission at least suggests—even if it does not Conclusively show—-that Congress has authority under Article I to make offenses triable by military commission even if those offenses are not war crimes under the international law of war.[7]
The Court in Quirin did not say that military commissions are constitutionally permitted only for international law of war *764 offenses. Nor did any later Supreme Court case hold that military commissions are constitutionally permitted' only for international law of war offenses. One would have expected the Court at some point to say as much if the Court actually thought as much.
An amicus brief nonetheless argues that the Quirin Court thought that international law was a constitutional constraint on Congress but that the Quirin Court believed, albeit mistakenly, that spying was an international law of war offense. See National Institute of Military Justice Ami-cus Br. at 14 n.6. The joint dissent agrees. See Dissenting Op. at 817-18. That argument lacks foundation. To begin with, the Supreme Court never said anything to the effect that Congress’s constitutional authority to make offenses triable by military commission is constrained by the international law of war. Moreover, the idea that the Court actually thought spying was an international law offense necessarily assumes that the Quirin Court—with Justices such as Harlan Fiske Stone, Felix Frankfurter, Robert Jackson, and Hugo Black—was ignorant of the content of international law. We cannot plausibly make such an assumption. There is no indication in the opinion or historical record that the Quirin Court actually believed that spying was an international law of war offense. Nor do- any later Supreme Court cases suggest as much. On the contrary, the Quirin Court cited authorities that indicated that spying was not an international law of war offense. See Quirin, 317 U.S. at 30 n.7, 31 n.8, 32, 34, 37, 63 S.Ct. 2 (citing, among other authorities, (i) the Hague Convention No. IV, art. 1 (annex), 36 Stat. 2295 and (ii) the 1940 U.S. War Department’s Rules of Land Warfare, which states in Paragraph 203 that spying “involves no offense against international law”).
To be sure, the Quinn Court discussed international law authorities. Those international, law authorities were relevant for, among other things,-determining whether the charged offenses could be tried by military commission under Article 15 of the Articles of War, which is present-day Article 21 of the Uniform Code of Military Justice, or 10 U.S.C. § 821. That statute has long used the broad term “law of war” to define the scope of offenses triable by military commission. The Court discussed those authorities in part because an offense’s status as an international law of war offense is sufficient but not necessary to make an offense triable by U.S'. military commission under the “law of war” prong of 10 U.S.C. § 821. See Quirin, 317 U.S. at 46, 63 S.Ct. 2; Al Bahlul v. United States, 767 F.3d 1, 65-72 (D.C. Cir. 2014) (en banc) (separate opinion of Kavanaugh, J.); see also Hamdan, 548 U.S. at 594-95, 126 S.Ct. 2749. But the Quirin Court never stated that the international law of war constituted a constitutional limit on Congress’s authority to make offenses triable by military commission.
Fourth, when we interpret the Constitution, especially the provisions related to the separation of powers, the historical practice of the Legislative and Executive Branches matters. See Zivotofsky n Kerry, — U.S. -, 135 S.Ct. 2076, 2091, 192 L.Ed.2d 83 (2015) (“In separation-of-powers cases this Court has often put significant weight upon historical practice.”) (internal quotation marks omitted); NLRB v. Noel Canning, — U.S. -, 134 S.Ct. 2550, 2560, 189 L.Ed.2d 538 (2014) (“[L]ongstanding practice of the government can inform our determination of what the law is.”) (internal quotation marks and citations omitted); The Pocket Veto Case, 279 U.S. 655, 689, 49 S.Ct. 463, 73 L.Ed. 894 (1929) (“Long settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions'....”); McCulloch v. Maryland, *765 17 U.S. (4 Wheat. 316), 401, 4 L.Ed. 579 (1819) (when considering a separation of powers question, court should “receive a considerable impression” from longstanding practice).
In this case, turning first to the Legislative Branch, Congress’s longstanding practice strongly supports the conclusion that international law is not a constitutional constraint on Congress’s authority to make particular crimes triable by military commission. From the earliest days of the Republic, Congress has gone beyond international law in specifying the offenses that may be tried by military commission. Beginning in 1776, the Continental Congress codified the offense of spying—a non-international-law offense—as a crime triable by military tribunal. See Resolution of the Continental Congress (Aug. 21, 1776), in 5 Journals of the Continental Congress 1774-1789, at 693 (Worthington Chauncey Ford ed. 1906) [hereinafter “Journals”] (authorizing trial by military court of “all persons, not members of, nor owing allegiance to, any of the United States of America ... who shall be found lurking as spies”); see also William Winthrop, Military Law and Precedents 765-66 & n.88 (rev. 2d ed. 1920). Likewise, in September 1776, Congress authorized trial by military tribunal for another non-international-law offense: aiding the enemy. See Articles of War (Sept. 20,1776), in 5 Journals, at 799. In 1789, after the Constitution was ratified, the First Congress adopted the same Articles of War that had been promulgated by the Continental Congress, including the offenses of spying and aiding the enemy. See Act of Sept. 29, 1789, ch. 25, § 4, 1 Stat. 95, 96 (1789). Again in 1806, Congress updated those provisions and, in doing so, was careful to preserve the offenses of spying and aiding the enemy as crimes triable by military tribunal. See Articles of War of 1806, ch. 20, arts. 56, 57, § 2, 2 Stat. 359, 366, 371 (1806). Both of those prohibitions remain on the books today. See 10 U.S.C. §§ 950t(26), 950t(27). Congress has made those two crimes triable by military commission even though they are not international law of war offenses.
Congress’s practice of going beyond international law has continued to the present. As recently as 2006 and 2009, Congress enacted new laws making several non-international-law offenses, such as solicitation and material support for terrorism, triable by military commission. See Military Commissions Act of 2006, Pub: L. No. 109-366,120 Stat. 2600, 2630; Military Commissions Act of 2009, Pub. L. No. 111-84,123 Stat. 2574, 2611.
That consistent congressional practice requires our respect. As the Supreme Court has stated, the “uniform, long-continued and undisputed legislative practice just disclosed rests upon áñ admissible view of the Constitution which, even if the practice found far less support in principle than we think it does, we should not feel at liberty at this late day to disturb.” United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 329, 57 S.Ct. 216, 81 L.Ed. 255 (1936).
The joint dissent responds that Congress, over the course of more than two centuries, actually thought itself bound by international law but believed (mistakenly) that those offenses—spying and aiding the enemy, for example—were in fact international law offenses. See Dissenting Op. at 791-92. That assertion seems to materialize out of thin air. We are aware of no credible support for the notion that Congress has believed itself bound by international law in this context or has thought that those offenses were in fact international law offenses. Moreover, the joint dissent does not deal with the persistence of congressional practice—from the Founding to the recent 2006 and 2009 Acts. In short, the deeply rooted congressional practice directly contradicts the joint dissent’s position.
*766 Fifth, in addition to the historical practice in Congress, the historical practice in the Executive Branch demonstrates that international law is not a constraint on which offenses may be tried by military commissions. Indeed, perhaps the most telling factor when considering this constitutional question is the deeply rooted history of U.S. military commission trials of the offense of conspiracy, which is not and has never been an offense under the international law of war. Cf. Zivotofsky, 135 S.Ct. at 2091 (“In separation-of-powers cases this Court has often put significant weight upon historical practice.”)' (internal quotation marks omitted); Noel Canning, 134 S.Ct. at 2560 (“[L]ongstanding practice of the government can inform our determination of what the .law is”) (internal quotation marks and citations omitted)..
The two most important military commission precedents in U.S. history—the trials of the Lincoln conspirators and the Nazi saboteurs—were trials for the offense of conspiracy.
Consider the trial of the Lincoln conspirators. After seeking the advice of the Attorney General, President Andrew Johnson decided to try the Lincoln conspirators by military commission rather than by criminal trial in civilian court. See Military Commissions, 11 Op. Attorney Gen. 297, 298 (1865). The Lincoln conspirators were expressly charged with and convicted of conspiracy—in that case, conspiracy to violate the law of war by killing the President and Commander in Chief of the Union Army, Abraham Lincoln, Indeed, conspiracy was the only offense charged against them. After an extensive multi-week trial that gripped the Nation and after vigorous argument about the facts and the commission’s jurisdiction, numerous conspirators were convicted of conspiracy.
The joint dissent tries to cast doubt on whether the Lincoln conspirators were actually tried for conspiracy. There is no doubt. Consider what a contemporary court said in response to a habeas petition filed by three of the Lincoln conspirators: “[T]he prisoners are guilty of the charge on which they were convicted—of a conspiracy to commit the military crime which one of their number did commit, and some of them of more or less participation.” Ex parte Mudd, 17 F.Cas. 954 (S.D. Fla. 1868).[8] Indeed, in the prior en banc decision in this case, our Court (joined by one of the judges who joins the joint dissent today) described the Lincoln case as a trial for conspiracy and stated that “the sole offense alleged was conspiracy.” At Bahlul v. United States, 767 F.3d 1, 25 (D.C. Cir. 2014) (en banc). Our en banc Court explained that the Lincoln case was a “particularly significant precedent” and a “high-profile example of a conspiracy charge tried by a military commission.” Id.; see also Al Bahlul v. United States, 792 F.3d 1, 59-61 (D.C. Cir. 2015) (Henderson, J., dissenting).
Consider also the military commission trial of the eight Nazi saboteurs who had been selected to execute Operation Pasto-rius—Adolf Hitler’s plan to destroy America’s war industries and facilities—and. secretly entered the United States during World War II. The defendants were expressly charged with and convicted of conspiracy, as well as of other offenses. Attorney General of the United States Francis *767 Biddle, who would later represent the United States as a judge at Nuremberg, personally prosecuted the case before the military commission. President Franklin Roosevelt reviewed and approved all of the convictions. The defendants filed habeas corpus petitions to block the proceedings as unconstitutional. The Supreme Court affirmed the legality of the trial, and in doing so, did not disturb the conspiracy charge. See Quirin, 317 U.S. at 46, 63 S.Ct. 2.
Later in World War II, moreover, the Government prosecuted another set of Nazi saboteurs for conspiracy and. tried them before a military commission. In that case, Assistant Attorney General Tom Clark, who would later serve on the Supreme Court, produced a formal memorandum—based in large part on the precedents involving the Lincoln conspirators and the earlier Nazi saboteurs—concluding that conspiracy was an offense triable by military commission. See Memorandum from Tom C.- Clark, Assistant Attorney General, to Myron C. Kramer, Judge Advocate General (Mar. 12, 1945), reprinted in Government Supplemental Appendix 104-10. In Assistant Attorney General Clark’s words, it was “well established that a conspiracy to commit an offense against the laws of war is itself an offense cognizable by a commission administering military justice.” Id. at 110. The military commission subsequently convicted the defendants of conspiracy. President Truman reviewed and affirmed the convictions. After one of those Nazi saboteurs later challenged his conviction in court, the Tenth Circuit affirmed the denial of his habeas petition, and the Supreme Court denied certiorari. The Tenth Circuit stated the charges against him were clearly “within the jurisdiction of the duly constituted Military Commission with power to .try, decide and condemn.” Colepaugh v. Looney, 235 F.2d 429, 432 (10th Cir. 1956), cert. denied, 352 U.S. 1014, 77 S.Ct. 568, 1 L.Ed.2d 560 (1957).
Put simply, the most well-known and important U.S. military commissions in American history tried and convicted the defendants of conspiracy. That history matters. See Zivotofsky, 135 S.Ct. at 2091; Noel Canning, 134 S.Ct. at 2559-60, And that history is .directly on point here because conspiracy is not an international law of war offense and because conspiracy is the precise offense that . Bahlul was charged with committing.
In response to all of this, the joint dissent says that there is no “robust history.” Dissenting Op. at 823. But to reiterate, the two most important military commission trials in U.S. history were trials for conspiracy, which is not an international law of war offense. From the beginning of the Nation, Congress and the President have gone well beyond international law when enacting legislation making offenses triable by military commission. To be sure, military commissions were not employed by the United States during the Korean War, the Vietnam War, or the Persian Gulf War. See Hamdan v. Rumsfeld, 548 U.S. 557, 597, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006) (plurality opinion) (“The last time the U.S. Armed Forces used the law-of-war military commission was during World War'll”).[9] So those wars do not supply us *768 with any additional examples of military commission trials, and thus do not tell us anything one way or the other about trying conspiracy or other non-international-law offenses before military commissions.
But in the two most significant U.S. wars of the last 200 years—the Civil War and World War II—as well as in the current war against al Qaeda and its associated forces, the U.S. has employed military commissions. And the most important military commission trials during those wars were trials for conspiracy, which is not an international law of war offense. That historical and contemporary practice cannot be airbrushed out of the picture. Prosecuting conspiracy and other non-international-law-of-war offenses is not at the periphery of U.S. military commission history and practice. Prosecuting conspiracy and other non-international-law-of-war offenses lies at the core of U.S. military commission history and practice.
As the Supreme Court cautioned in Noel Canning, we must be “reluctant to upset this traditional practice where doing so would seriously shrink the authority that Presidents have believed existed and have exercised for so long.” Noel Canning, 134 S.Ct. at 2573. Moreover, the Supreme Court has explained that historical practice constitutes “an important interpretive factor even when the nature or longevity of that practice is subject to dispute, and even when that practice began after the founding era.” Id. at 2560.
In short, the text and original understanding of the Constitution; the structure of the Constitution; landmark Supreme Court precedent; the deeply rooted historical practice of the Legislative Branch, as seen in federal statutes; and the longstanding practice of the Executive Branch, as seen in U.S. military commission practice stretching back over two centuries, all point decisively to the same conclusion: The war powers clauses of Article I of the Constitution do not impose international law as a constraint on Congress’s authority to establish offenses triable by military commission.
II
Bahlul also contends that Article III of the U.S. Constitution confines U.S. military commissions to international law of war offenses.
This iteration of Bahlul’s argument begins with the premise that Article III vests the judicial power in Article III courts and requires crimes to be tried by jury, not before military commissions.[10] Based solely on the text of Article III, Bahlul might have a point. But the Supreme Court has long recognized an exception to Article III for military commissions to try enemy war crimes. See Ex Parte Quinn, 317 U.S. 1, 38-45, 63 S.Ct. 2, 87 L.Ed. 3 (1942); see also Hamdan v. Rumsfeld, 548 U.S. 557, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006).
Exceptions to Article III, including the exception for military commissions, are established and interpreted in light of historical practice. See Northern Pipeline Construction Co. v. Marathon Pipe Line Co., 458 U.S. 50, 64, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (plurality opinion) (“[T]he literal command of Art. Ill ... must be interpreted in light of the historical context in which the Constitution was written, and of the structural imperatives of the Constitution as a whole.”); Quirin, 317 U.S. at 39, 63 S.Ct. 2 (“[I]t was not the purpose or *769 effect of § 2 of Article III, read in the light of the common law, to enlarge the then existing right to a jury trial.”); see also Stern v. Marshall, 564 U.S. 462, 504-05, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011) (Scalia, J., concurring) (“[A]n Article III judge is required in all federal adjudications, unless there is a firmly established historical practice to the contrary.”); see generally Zivotofsky v. Kerry, — U.S. -, 135 S.Ct. 2076, 2091, 192 L.Ed.2d 83 (2015) (“In separation-of-powers cases this Court has often put significant weight upon historical practice.”) (internal quotation marks omitted); Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 610, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Frankfurter, J., concurring) (“Deeply embedded traditional ways of conducting government cannot supplant the Constitution or legislation, but they give meaning to the words of a text or supply them.”); The Pocket Veto Case, 279 U.S. 655, 689, 49 S.Ct. 463, 73 L.Ed. 894 (1929) (“Long settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions of this character.”); McCulloch v. Maryland, 17 U.S. (4 Wheat. 316), 401, 4 L.Ed. 579 (1819) (“[A] doubtful question, one on which human reason may pause, and the human judgment be suspended, in the decision of which the great principles of liberty are not concerned, but the respective powers of those who are equally the representatives of the people, are to be adjusted; if not put at rest by the practice of the government, ought to receive a considerable impression from that practice.”).
In this context, if historical practice demonstrates that an offense is triable by U.S. military commission, that history resolves the Article III issue. As explained in Part I of this opinion, the history of U.S. military commissions trying non-international-law-of-war offenses is extensive and dates from the beginning of the Republic. That historical practice therefore amply demonstrates that Article III is not a barrier to U.S. military commission trials of non-international-law-of-war offenses, including the offense of conspiracy to commit war crimes.
Notwithstanding that history, Bahlul says that Quirin already considered the military commission exception to Article III and limited the exception to international law of war offenses.
Bahlul’s reading of Quirin is incorrect. In Quirin, the Nazi saboteur defendants claimed that they had a right under Article III to be tried by jury in an Article III federal court and therefore could not be tried by military commission. At some length, the Quirin Court specifically considered and rejected the defendants’ Article III objection. See Quirin, 317 U.S. at 38-45, 63 S.Ct. 2.[11] The Court explained that Article III did not “enlarge the then existing right to a jury trial” beyond the right as it existed at common law. Id. at 39, 63 S.Ct. 2. Because the common law did not preclude trial by military commission for war crimes, Article III “cannot be taken to have extended the right to demand a jury to trials by military commission, or to have required that offenses against the law of war not triable by jury at common law be tried only in the civil courts.” Id. at 40, 63 S.Ct. 2.
As explained above, in reaching its conclusion on the Article III issue, the Quirin Court emphasized that Congress—exercising its Article I powers—had made spying an offense triable by military commission since the earliest days of the Republic. The Court stated that the early Congress’s en *770 actment of the spying statute “must be regarded as a contemporary construction” of Article III “as not foreclosing trial by military tribunals, without a jury, of offenses against the law of war committed by enemies not in or associated with our Armed Forces.” Id. at 41, 63 S.Ct. 2. “Such a construction,” the Court said, “is entitled to the greatest respect.” Id. at 41-42, 63 S.Ct. 2.
The Supreme Court’s analysis in Quirin is instructive for present purposes because, as noted above, the offense of spying on which the Quirin Court relied to answer the Article III objection was not (and is not) an offense under the international law of war. It thus makes little sense to read Quirin as barring military commission trials of non-international-law-of-war offenses when Quirin, in rejecting a jury trial objection to military commissions, expressly relied on a longstanding statute making spying—a- non-international-law-of-war offense—triable by military commission.
In addition, as previously discussed, nothing about the Court’s reasoning in Quirin rested on whether the offense tried by a military commission was an international law of war offense. The Court never suggested that military commissions are constitutionally permitted only for international law of war offenses. Nor has the Court ever said anything like that in its several later military commission eases. One would have expected the Court to say as much if the Court actually thought as much.
To be sure, the Quirin Court referred to international law authorities. But as noted above, the Court discussed those authorities in part because an offense’s status as an international law offense is sufficient but not necessary to make an offense triable by military commission under 10 U.S.C. § 821, ■ the statute that used the broad term “law of war” to define offenses triable by military commission.
In short, Article III does not limit U.S. military commissions to international law of war offenses or otherwise foreclose trial of the offense of conspiracy to commit war crimes before U.S. military commissions.[12]
All of that said, the Constitution does not grant Congress unlimited authority to designate crimes as triable by military commission. At oral argument, the Government stated that the charges must at least involve an enemy combatant who committed a proscribed act during or in relation to hostilities against the United States. See Tr. of Oral Arg. at 37. In general, if an offense is an international law of war - offense or has historically been tried by U.S. military commission, that is sufficient to uphold Congress’s constitutional authority to make the offense triable by military commission. See generally Quirin, 317 U.S. at 24-48, 63 S.Ct. 2. As Winthrop explained, the war crimes triable by U.S. military commission are “derived from International Law, supplemented by acts and orders of the military power and a few legislative provisions.” William Winthrop, Military Law and Prboedents 773 (rev. 2d ed. 1920).
But is one of those conditions necessary? In other words, what if an offense is neither an international law of war offense nor historically rooted in U.S. military commission practice? Consider a hypothetical new statute that makes cyber-attacks by enemy forces a war crime triable by military commission. Quirin stated that Article III does “not restrict whatever authority was conferred by the Constitution to try offenses against the law of war by *771 military commission,” and does not bar “the practice of trying, before military , tribunals without a jury, offenses committed by enemy belligerents against the law of war.” Quirin, 317 U.S. at 45, 41, 63 S.Ct. 2. Perhaps that language suggests that Article III permits what Article I authorizes with respect to which enemy war crimes may be tried by U.S. military commission. But we need not answer that hypothetical in this case and need not define, with precision the outer limits of the Constitution in this context, other than to say that international law is not such a limit. Wherever one might ultimately draw the outer boundaries of Congress’s authority to establish offenses triable by military commission, the historically rooted offense of conspiracy to commit war crimes is well within those limits. An enemy of the United States who engages in a conspiracy to commit war crimes—in Bahlul’s case, by plotting with Osama bin Laden to murder thousands of American civilians—-may be tried by a U.S. military commission for conspiracy to commit, war crimes.
Ill
In light of the importance of this case, and the serious and passionate arguments advanced by the joint dissent, we close with a few additional- responses to points made by the joint dissent.
First, in reaching its conclusion, the joint dissent relies in part on Hamdan v. Rumsfeld, 548 U.S. 557, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006). That reliance is misplaced. As relevant here, Hamdan was a statutory case interpreting the phrase “law of war” in 10 U.S.C. § 821. Nowhere did the Supreme Court ever say (or even hint) that the United States Constitution imposed international law as a- limit on what offenses may. be tried by U.S. military commissions. The joint dissent’s citations to Hamdan therefore do not support its constitutional position.
In fact, the Hamdan decision and its aftermath only highlight the extraordinary nature of the joint dissent’s position. In Hamdan, the Court confronted but ultimately did not resolve the question of whether the relevant statute in effect at the time, 10 U.S.C. §-821, barred military commission trials of alleged war criminals for conspiracy. .But four of the Justices in the majority expressly invited Congress to clarify the scope of military commission power. Hamdan, 548 U.S. at 636, 126 S.Ct. 2749 (Breyer, J., concurring, joined by Kennedy, Souter, and Ginsburg, JJ.); id. at 653, 126 S.Ct. 2749 (Kennedy, J., concurring in part, joined in relevant part by Souter, Ginsburg, and Breyer, JJ.). In response to the Justices’ invitation, Congress and the President promptly enacted new legislation to make crystal clear that conspiracy is an offense triable by military commission. Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600, 2625, 2630 (expressly authorizing trials before military commissions for conspiracy offenses).
A decade after Hamdan, Bahlul and the joint dissent have now come back with a novel and extraordinary constitutional interpretation that would thwart the considered wartime decisions of- two Congresses and two Presidents—decisions invited by the Supreme Court in Hamdan—to authorize military commission trials- of conspiracy offenses. Under the joint dissent’s theory, the congressional action invited by the Supreme Court was -all a waste of time because U.S. military- commissions are constitutionally barred from trying the offense of conspiracy, regardless of statutory authorization. But in Hamdan, not a single Justice hinted at a lurking constitutional problem with trying conspiracy offenses before military commissions (nor did Ham-dan himself in his arguments to the Supreme Court, either directly or through a constitutional avoidance argument). To be *772 sure, the Hamdan decision does not formally preclude the Supreme Court from now returning to the scene and finding a previously missed constitutional problem with trying conspiracy offenses by military commission. But in this wartime context, one should not lightly assume that the Supreme Court expressly encouraged the political branches to launch into an utterly meaningless, decade-long exercise.
. Second, the joint dissent says: “It is not international law, however, that constrains Congress’s authority here—it is Article III.” Dissenting Op. at 827-28. That sentence glides over the key question. The question is whether Article III (or Article I) incorporates international law as a constraint on U.S. military commissions. The joint dissent says yes. But the constitutional text and structure, Supreme Court precedents, and deeply rooted, U.S. history tell us that the answer is no.
Of course, the consistent U.S. history is the consistent U.S. history for a reason. As explained above, the consequences for the United States of judicially incorporating international law into the U.S. Constitution would be deeply problematic and run afoul of our most fundamental constitutional principles and traditions. International law often embodies a majority or consensus view of nations. Does the United States Constitution really allow foreign nations, through the guise of international law, to set constitutional limits enforceable in U.S. courts against the U.S-. war effort? Under Bahlul’s argument, and under the theory advanced by the joint dissent, the answer would be yes. We think not. We see- no basis in U.S. law, precedent, or history—not to mention, common sense— for that position. To paraphrase Justice Jackson, the Constitution is not “a suicide pact.” Terminiello v. Chicago, 337 U.S. 1, 37, 69 S.Ct. 894, 93 L.Ed. 1131 (1949) (Jackson, J., dissenting).
To be sure, the Judiciary plays a critical role in enforcing constitutional and statutory limits in justiciable wartime cases, and this Court must not hesitate (and has not hesitated) in doing so, even when the consequences are significant. See Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); Al Bahlul v. United States, 767 F.3d 1 (D.C. Cir. 2014) (en banc) (Ex Post Facto Clause bars Congress and the President from making material support for terrorism a war crime that can be retroactively prosecuted before a military commission); Hamdan v. United States, 696 F.3d 1238 (D.C. Cir. 2012) (same, via constitutional avoidance doctrine). But in this case, neither Article I nor Article III confines Congress to international law of war offenses when Congress establishes war crimes triable by military commission.
To be clear, we take no position on the policy question of whether the U.S. Government should use military commissions to try the offense of conspiracy or other non-international-law-of-war offenses, or indeed whether the Government should use military commissions at all. That policy decision belongs first to Congress and the President in the legislative process, and then to the President in the exercise of his or her Commander-in-Chief power. Likewise, we take no position on the general question of when and how Congress and the President should weigh international law principles in making those decisions. International law is important, and the political branches have good reason to adhere to international law when determining what offenses will be tried before U.S. military commissions. But international law has its own enforcement mechanisms. The federal courts are not roving enforcers of international law. And the federal courts are not empowered to smuggle international law into the U.S. Constitution and *773 then wield it as a club against Congress and the President in wartime.
Third, the joint dissent seeks to explain away the history and practice of U.S. military commissions. But that effort is entirely unpersuasive.
In the face of the deeply rooted U.S. history and practice of trying conspiracy offenses by military commission, the joint dissent had two options. It could discount the importance of history to the constitutional analysis, and try to explain that the constitutional text and structure matter most here. The joint dissent did not choose that approach, no doubt because the constitutional text and structure also show what the history shows: that international law is not a constraint on Congress when Congress determines which offenses may be tried by military commission.
Alternatively, the joint dissent could attack the history head-on on the theory that the history does not actually show what it seems to show. That is the route that the joint dissent chose. But it does not work. Consider all of the contortions the joint dissent has to make in attempting to wriggle out of the history. First, faced with the historical fact that Congress since the Founding has consistently made non-international-law offenses triable by military commission, the joint dissent unconvincingly posits that those Congresses all mistakenly believed that those offenses actually were international law offenses (even though they were not and even though there is no persuasive evidence that Congress thought they were). See Dissenting Op. at 821-22. Second, faced with the historical fact that the Executive Branch’s two most important military commissions in the history of the country were trials of conspiracy offenses, which are not international law offenses, the joint dissent implausibly suggests that the Lincoln case was not really a conspiracy case (even though it plainly was), and it notes that the conspiracy charges against the eight Nazis at issue in Quirin were never directly reviewed by a court (even though the relevant point is that the military commission trial of the Nazis for conspiracy remains a central part of Executive Branch historical practice). See id. at 823-24, 825-27. Third, faced with the fact that the Supreme Court relied on a non-international-law offense, spying, in its landmark Quirin decision upholding military commissions, the joint dissent seeks to sweep that inconvenient snippet under the rug by suggesting that the Court mistakenly believed that spying was an international law offense (even though there is no persuasive evidence that the Court actually thought as much). See id. at 771-72.
The bottom line here is that the history matters, the history is overwhelming, and the history devastates the joint dissent’s position.
Fourth, in justifying its position, the joint dissent posits a hypothetical of non-U.S.-citizens living together in an apartment in Virginia with pipe bombs, al Qae-da propaganda, and a map of the Washington Metro. The joint dissent says it would be “dangerous” to apprehend such a group and then try them for conspiracy before a military commission. Dissenting Op. at 836-37. We are mystified by the joint dissent’s apparent belief that this is a helpful hypothetical for its position. We take it that the point of the hypothetical is to suggest that military commissions should not be used to try non-citizen enemy terrorists who are (i) captured in the United States (ii) before they commit their planned attacks. Of course, the current war has no such neat geographical boundaries. And neither did World War II, for that matter. After all, the Nazi saboteurs were captured in the United States before their planned attacks on U.S. facilities. They were then prosecuted before U.S. military commissions. And if Mohamed *774 Atta and • his fellow attackers had been captured on the night of September 10, 2001, in Portland, Maine, and elsewhere, and then tried before congressionally ■ authorized U.S. military commissions for conspiracy, we certainly would not have characterized that scenario as “dangerous.”
Fifth, the joint dissent insists that the mission of the military is to defeat enemies on the battlefield, not to punish enemy wrongdoers. See Dissenting Op. at 829-30. The dissent’s effort to define U.S. military strategy in that way is both legally and factually flawed. As the Supreme Court has long recognized, including in landmark cases such as Hamdi, war is waged not only by killing enemy combatants, but also by surveilling, capturing, and detaining enemy forces, and by trying unlawful enemy combatants for war crimes. And in the current war, the modus operandi of the enemy is to target citizens; to frighten, unsettle, disrupt, and demoralize; to make normal peaceful life impossible and carnage routine. In response to the enemy’s tactics, two Congresses and two Presidents—like their predecessors throughout U.S. history—have determined that employing military commissions to try unlawful enemy combatants for their war crimes is an important part of the overall war effort. The Constitution assigns that question of military strategy to Congress and the President, not to the joint dissenters.
Sixth, and relatedly, in seeking to minimize the consequences of its theory, the joint dissent suggests that military commissions .are not essential to the U.S. war effort because the U.S. Government can simply try al Qaeda war criminals in federal courts, including for conspiracy to com-mitwar crimes. See, e.g., Dissenting Op. at 804, 828-29, With, all respect, the joint dissent has no business making such a statement. It has no basis to express such confidence and no relevant expertise on that question of wartime strategy. Unlike the joint dissenters, Presidents Bush and Obama, as well as the two Congresses in 2006 and 2009, determined that the ordinary federal court process is not suitable for trying certain enemy war criminals. The only question for us as judges is one of law: whether the U.S. Constitution permits that policy choice by Congress and the President. If the answer were no, then we would enforce the Constitution. Cf. Hamdi v. Rumsfeld, 542 U.S. 507, 577, 124 S.Ct. 2638, 159 L.Ed.2d 578 (2004) (Sealia, j., dissenting). But here, the answer is yes.
⅜ ⅜ ⅜
We vote to affirm Bahlul’s conviction for conspiracy to commit war crimes.

. The Government argues that Bahlul forfeited this claim. Even if that were true, the Court should review the claim de novo, not simply for plain error. In rare and extraordinarily important cases, the Court has discretion to hear even a forfeited claim de novo. See Plant v. Spendthrift Farm, Inc., 514 U.S. 211, 232, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995). The question of whether conspiracy may constitutionally be tried by military commission is extraordinarily important and deserves a “definitive answer.” Al Bahlul v. United States, 767 F.3d 1, 62 (D.C. Cir. 2014) (en banc) (separate opinion of Brown, J.). The question implicates an important part of the U.S. Government's war strategy, And other cases in thé pipeline require a clear answer to the question. This case unfortunately has been pending in this Court for more than five years. It is long past time for us to resolve the issue squarely and definitively.
Judge Kavanaugh adds that he would apply de novo review for that reason, as well as for any of five other independent reasons. First, before the military judge, Bahlul objected to the military commission’s authority to try him for the charged offenses. Bahlul did not forfeit this claim. Second, even if Bahlul had not objected, the question of whether the Constitution requires Article III courts to try conspiracy offenses is a structural question of subject matter jurisdiction, and cannot be forfeited or waived. See Ex Parte Quirin, 317 U.S. 1, 25, 63 S.Ct. 2, 87 L.Ed. 3 (1942) (describing the question as one of "jurisdiction”). Third, in any event, Rules 905 and 907 of the Rules for Military Commissions require de novo judicial review of the question whether a charged offense may be tried by military commission. Fourth, even if all of those points are incorrect, the Government has repeatedly forfeited any forfeiture argument during the course of this litigation. For example, before the U.S. Court of Military Commission Review, the Government expressly acknowledged that Bahlul's argument was not forfeited or waived. See Bahlul Appendix at 161 n.5 (quoting Government's submission: “The Government does not argue” that Bahlul’s argument "questioning jurisdiction” is "waived.”). Only at the 11th hour has the Government belatedly claimed that Bahlul forfeited his constitutional argument. Fifth, even if Bahlul forfeited his argument and plain error review applied here, the Court when applying plain error often holds that there was no error, rather than merely holding that any possible error was not plain. We should do the same here.

. To be clear, Congress may and sometimes does incorporate international law principles into statutes. In doing so, Congress may on occasion enact statutes that simply refer to “international law” in general terms. See, e.g., 22 U.S.C. §§ 5604-5605 (empowering the President to impose sanctions on foreign *761 countries that use chemical or biological weapons "in violation of international law”). Likewise, the President and Senate may enter into self-executing treaties with foreign nations. See Medellin v. Texas, 552 U.S. 491, 505 n.2, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008). Those statutes and self-executing treaties are U.S. law, not international law.

. Judge Henderson and Judge Brown have previously concluded that the Define and Punish Clause grants Congress authority to make conspiracy ah offense triable by military commission. See Al Bahlul v. United States, 792 F.3d 1, 44-55 (D.C. Cir. 2015) (Henderson, J., dissenting); Al Bahlul v. United States, 767 F.3d 1, 53-62 (D.C. Cir. 2014) (en banc) (separate opinion of Brown, J.).

. On September 18, 2001, Congress authorized the use of force against al Qaeda and related terrorist groups. See Authorization for Use of Military Force, Pub. L. No. 107-40, 115Stat. 224.

. Contrary to the suggestion advanced by Bahlul and the joint dissent, it. would be absurd to say that the war powers clauses grant Congress authority to establish military commissions but not to specify, which offenses may be tried by military commission. There is no support in Supreme Court precedent for slicing and cabining Congress's war powers authority in that way. Moreover, the longstanding historical practice in the Legislative and Executive Branches flatly contravenes that suggestion,

. The Quirin Court’s discussion of spying was not dicta. One primary basis for the Court's finding a military commission exception to Article III was the longstanding statute that made spying an offense triable by military commission. See Quirin, 317 U.S. at 41-42, 63 S.Ct. 2. But even if the Supreme Court's reference to spying were dicta, we as a lower court generally treat Supreme Court dicta as authoritative. See United States v. Dorcely, 454 F.3d 366, 375 (D.C. Cir. 2006) (''[Cjarefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative,”) (internal quotation marks and citations omitted); Bangor HydroElectric Co. v. FERC, 78 F.3d 659, 662 (D.C. Cir. 1996) (‘‘It may be dicta, but Supreme Court dicta tends to have somewhat greater force—particularly when expressed so unequivocally.”). The Quirin Court’s discussion of spying was hardly the kind of stray comment that a lower court can or should cast aside.

. To be sure, the Quirin Court did not expressly state that Congress may make non-international-law-of-war offenses triable by military commission. Had it explicitly done so, the question would be indisputably resolved and we would not be facing the current litigation, after all. But in considering an objection to trial by military commission, the Court did rely on a longstanding statute that made spying, a non-international-law-of-war offense, triable by military commission.

. Although the original records for the Southern District of Florida from that time period were initially lost, a copy of Judge Boynton’s opinion for the court is on file with the Library of Congress. Moreover, the opinion was published in full in the New York Times on October 1, 1868—precisely one month after the decision was handed down by the court. The Application in Behalf of Dr. Mudd, Arnold and Spangler—Opinion of Judge Boynton, N.Y. Times at 2 (Oct. 1, 1868).

. In the Korean War, General Douglas MacArthur—who was serving as the head of the U.S. and United Nations forces in Korea— issued regulations specifying conspiracy to commit war crimes as an offense triable by military commission. See U.N. Command, Rules of Criminal Procedure for Military Commissions of the United Nations Command at Rule 4 (Oct. 22, 1950) (establishing that "all attempts to commit, or conspiracies and agreements to commit ... violations of the laws and customs of war” committed during the Korean War were to be punishable by U.N. military commission). But no U.S. military commis *768 sions ultimately were convened during that war.

. See U.S. Const, art. Ill, § 1 ("The judicial Power of the United States, shall be vested .... ”); id. § 2, cl. 3 ("The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury ....”).

. The Court also referred to the Fifth and Sixth Amendments when talking about Article III, but the Court analyzed them together. For ease of reference, we will refer only to Article III.

. Bahlul also has raised equal protection and First Amendment challenges to his conviction. Those arguments are frivolous, for reasons explained in Al Bahlul v. United States, 767 F.3d 1, 75-76 (D.C. Cir. 2014) (en banc) (separate opinion of Kavanaugh, J.).